UNITED STATES of America, Appellant,

v.

Joseph A. CHADWICK et al.,
Defendants-Appellees.

No. 75–1165.

United States Court of Appeals,
First Circuit.

Argued Sept. 9, 1975.
Decided March 29, 1976.

Lawrence P. Cohen, Asst. U. S. Atty., Deputy Chief, Crim. Div., Boston, Mass., with whom James N. Gabriel, U. S. Atty., Boston, Mass., was on brief, for appellant.

Jeanne Baker, Cambridge, Mass., with whom Rosenberg & Baker, Cambridge, Mass., Martin G. Weinberg and Oteri & Weinberg, Boston, Mass., were on brief, for Joseph A. Chadwick, appellee; Robert L. Steadman, Boston, Mass., on brief for Bridget Ann Leary, appellee.

Before COFFIN, Chief Judge, CAMP-BELL, Circuit Judge, THOMSEN,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

The United States has appealed under 18 U.S.C. § 3731 from the district court's allowance of motions to suppress evidence.

Chadwick, Machado, and Leary, following their arrest on May 10, 1973, were indicted for possession of marijuana with intent to distribute and for conspiracy. 21 U.S.C. §§ 841(a)(1) and 846. Prior to their trial, they moved to suppress evidence of marijuana seized from a footlocker, two suitcases and Chadwick's person, and Chadwick's remarks while in custody. After an evidentiary hearing, the district court ruled in the defendants' favor, 393 F.Supp. 763, and it reaffirmed and amplified its rulings after hearing the Government's motion for reconsideration. *Id.* at 773. This appeal followed.

* From the District of Maryland, sitting by designation.

The circumstances of defendants' arrests and the subsequent searches were described by federal agents Richard G. Christopher and Paul L. LaVoie, both assigned to the Office for Drug Abuse Law Enforcement (ODALE), and by Robert Walsh, police officer for Penn Central Railroad. On May 8, 1973, information was relayed to LaVoie in Boston from the ODALE office in San Diego, California, that an old brown trunk or footlocker, suspected to contain marijuana, was en route from California to Boston by Amtrak train. The San Diego office had been tipped off by an Amtrak official, who suspected that the footlocker contained marijuana because it was leaking talcum powder, a material used to cover up the odor of controlled substances, and because of its unusual weight for its size, almost two hundred pounds. The appearance of the person shipping the footlocker, identified as Machado, fit a profile used by Amtrak officials to spot drug traffickers. The tag bore Machado's address in Scituate, Massachusetts. According to ticketing information, he was accompanied by another person later identified as Leary.

Descriptions of both Machado and the footlocker were transmitted to the Boston agents who learned that the train would arrive in Boston the evening of May 10. Between the eighth and the tenth, the agents sought no search or arrest warrants, but continued investigating. When the train passed through New Haven, Connecticut, prior to its arrival in Boston, Amtrak officials checked the baggage compartment and verified that the footlocker was still on board. Agent Christopher testified that "the suspicion was sufficient to justify an expenditure of men and energy at South Station," and so six law enforcement officials were gathered at South Station at 6:50 p. m. on May 10 to await the train. It finally arrived at 8:50 p. m., approximately one hour behind schedule. A few minutes later, Agent Christopher spotted a suspect fitting Machado's description inside the terminal. Christopher saw Machado make a

telephone call but was unable to see the number which was dialed or overhear the conversation. Agent Christopher also saw the footlocker as it was removed from the baggage car, placed on a baggage cart, and taken in to the station area, where it was claimed by Machado and a female companion, later identified as Leary. They placed it on the floor near an abandoned magazine stand and sat down on it. Agent Christopher never saw the trunk open. The couple also had with them two suitcases.

The agents had brought with them Duke, a detector dog, trained to sniff out controlled substances. Duke's handler walked him on his leash by Machado and Leary several times. Agent Christopher then told the handler to release Duke near the footlocker, whereupon Duke went to the locker and gave an "alert response" by scratching on it, indicating that he detected a controlled substance inside. The handler had not been instructed, however, to have Duke also smell the suitcases, and so immediately after the alert to the footlocker, he picked up Duke's leash and walked Duke out of the building.

Chadwick was seen for the first time a few minutes later walking into the terminal. He came over to Machado and Leary and the three engaged in conversation for a moment. Chadwick then left the terminal [1] and went outside to the street where a Dodge Polara, later found to have been rented, was parked. Machado and Leary engaged a red cap who physically transported the footlocker out to the car where Chadwick was waiting. Leary climbed into the front passenger seat, putting one of the suitcases inside the passenger compartment. The red cap loaded the footlocker into the trunk of the Dodge with the help of Machado and Chadwick, the red cap doing most of the lifting. The other suitcase was placed in the trunk of the Dodge with the footlocker.

As soon as the red cap was clear of the vehicle, before the trunk lid was closed or

1. The district court found that the three "engaged in brief conversation after which they all left the station with a railroad porter." However, it is clear from Agent Christopher's testimony that Chadwick left the terminal alone, before Machado, Leary, and the luggage.

the car engine started, the federal agents closed in and arrested the trio. It was then about 9:15. Machado and Chadwick were standing at the back of the vehicle; Leary was seated in the front seat. The two males were quickly frisked and all three were handcuffed. No guns or weapons were found on any of them. Keys to the footlocker and receipts and documents of ownership were found on Machado, but no keys or documents were found on Chadwick so as to link him to the footlocker. A key was found on Chadwick's person, of which a duplicate or similar type was found in Leary's possession; it was believed to be a safe deposit box key, not a trunk key. They were all then taken in government vehicles, Chadwick and Machado in one and Leary in another, to the John F. Kennedy Building (JFK). The Dodge Polara was seized for the purpose of forfeiture because of its use to facilitate the transportation of marijuana, 21 U.S.C. § 881. One of the agents drove it to JFK at the same time, the footlocker and suitcases still inside. Subsequent to the arrest, Agent Christopher testified, the footlocker was under his control at all times. No accomplices were suspected or known to be in the area.

En route to JFK, a five minute trip, Officer Walsh read to Chadwick and Machado their *Miranda* rights. Agent Christopher repeated the warnings and asked Chadwick point by point if he understood those rights and that he could waive those rights. Chadwick acknowledged that he understood that he could waive them. He was not requested to execute a waiver and there is no evidence that he did so. Machado refused to give his name or answer any questions. There was then a brief exchange between Agent Christopher and Chadwick. As Agent Christopher recounted the conversation:

"I asked the defendant Mr. Chadwick his name, and he gave it to me.

I asked the defendant Machado his name, and he refused to answer.

I then asked Mr. Chadwick how it came to be that he was—where he was from? And he said, Salem, New Hampshire.

I asked him why he was all the way down here from Salem, New Hampshire? And he said that Mr. Machado had called him.

He asked me how I knew what was in the trunk. And I told him that he had it wrong; I asked the questions.

I asked him how he knew what was in the trunk, and he didn't answer. He said he didn't know what was in the trunk.

I asked him what his phone number was.

He said he didn't have a phone.

Then I asked him how he could get a call from Mr. Machado?

He said that everything that he said I was twisting, and he didn't care to answer any more questions."

Chadwick said nothing further. After they arrived at JFK, Agent Christopher put Chadwick through routine booking information. *Miranda* warnings were repeated and there was further conversation:

"I took routine booking information— name, address, and so on.

At that time Mr. Chadwick stated that he lived, I think it was 100 Riverway in Brookline or near Boston. I don't recall if it was Brookline or not.

I again asked him for his phone number at that address. He said he had no phone.

I asked him how he got the phone call from Mr. Machado. He said he received it on the phone of a friend who lived in the apartment above him at 100 Riverway, that would be the third floor apartment.

And I believe I asked him how he knew to be at that phone at that particular time to receive a call. I don't believe he responded to that question.

I don't think there were any other questions other than booking information asked of him."

A small quantity of marijuana was found on Chadwick's person.

The footlocker and suitcases were taken into the ODALE office at JFK within minutes of the prisoners' arrival. The footlock-

er was double-locked with a padlock and regular trunk latch, which the agents first noticed when they removed it from the Dodge Polara at JFK. It was opened in the ODALE office by the agents, using the keys found on Machado, sometime between 9:30 and 11:00 p. m. A large quantity of marijuana was found inside. Agent Christopher testified that the search was delayed until they reached JFK because there were too many people on the street at South Station when the arrest was made. The two suitcases were also brought into the ODALE office for inventory pursuant to Drug Enforcement Administration regulations. The agents did not suspect that they contained marijuana. Both suitcases were locked; none of the defendants claimed ownership or produced keys, and permission to open the suitcases was not sought or obtained from any of them. The agent in charge broke the suitcases open. Marijuana was found inside both. No inventory list of their contents was offered into evidence, nor was there evidence that one was prepared.

No search warrants were ever secured for either the footlocker or the suitcases.

*Warrantless Search of Footlocker*

■ The warrantless footlocker search was made at the ODALE office an hour or so after defendants were arrested and the footlocker seized. At the time of the search, the agents had without doubt probable cause to believe there was a controlled substance therein. They did not, however, possess a search warrant. The question, therefore, is whether their warrantless search fits within one of the exceptions to the constitutional requirement of a warrant, for, as the Supreme Court has said, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585 (1967), *quoted in Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2031, 29 L.Ed.2d 564, 575 (1971); *United States v. Watson,* 423 U.S. 411, 425, 96 S.Ct. 820, 828, 46 L.Ed.2d 598, 599, 44 U.S.L.W. 4112, 4116, 4117 (1976) (Powell, J., concurring). The burden, moreover, "is on those seeking the exemption to show the need for it." *United States v. Jeffers,* 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59, 64 (1951).

■ At the first suppression hearing, the Government sought to justify the warrantless search of the footlocker under the so-called automobile exception. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *see Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975). It argued that as the vehicle itself could have been searched without a warrant, so also could the footlocker, as part of its contents. *See United States v. Tramunti,* 513 F.2d 1087, 1104–05 (2d Cir. 1975); *United States v. Soriano,* 497 F.2d 147 (5th Cir. 1974) (en banc). But the district court, quoting *Coolidge v. New Hampshire, supra,* 403 U.S. at 461–62, 91 S.Ct. at 2035, 29 L.Ed.2d at 580 (Stewart, J.), to the effect that "[t]he word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears," held that "there was no nexus between the search and the automobile, merely a coincidence." It pointed out that the agents had monitored the progress of the porter and defendants as they moved the footlocker from the station to the vehicle. The arrest and seizure occurred just after the footlocker had been deposited in the parked car's trunk. The trunk lid was still open, the driver was not yet at the wheel, and the motor had not yet been started. "Under the circumstances," said the court, "the floor of the automobile trunk was nothing more than a platform or resting place for the footlocker." We agree. No reason comes to mind why the footlocker's placement in the car trunk should make it any more searchable than if the arrest had occurred in the station area. *See Coolidge v. New Hampshire, supra.*

■ Upon petitioning the district court for reconsideration, the Government no longer pressed the automobile exception, but rather turned to its present theory, that a warrantless search of the footlocker was permitted "incident" to the arrest of its owner (Machado),[2] and that such a search was therefore lawful when conducted a short time later at the ODALE office. *See United States v. Edwards*, 415 U.S. 800, 803, 94 S.Ct. 1234, 1237, 39 L.Ed.2d 771, 775 (1974) ("searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention"). *But see Preston v. United States*, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777, 780 (1964).

The district court found the Government's new theory unpersuasive. The court held that the footlocker could not have been searched incident to the arrest as it was then outside the area of defendants' immediate control. The court relied on *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), which restricts a warrantless search incident to an arrest to the arrestee's person and the area "within his immediate control," meaning "the area from within which he might gain possession of a weapon or destructible evidence." *Id.* at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694. The court found that a "double-locked, 200 pound container" that had already been placed in the open trunk of the automobile at the time of the arrest was not an "area within his immediate control"; and as the search of the locker could not be justified as a search incident to the arrest had it taken place contemporaneously with the arrest, the later search was illegal *a fortiori*. 393 F.Supp. at 375 & n. 4.

The Government now contends (1) that the district court erred in relying on

*Chimel*, and (2) that the footlocker was within defendants' control at the time of arrest, even under *Chimel*.

As to the first point, the Government stresses that *Chimel* involved the search of a house, and points to language in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and in this court's decision in *United States v. DeLeo*, 422 F.2d 487, 492 (1st Cir.), *cert. denied*, 397 U.S. 1037, 90 S.Ct. 1355, 25 L.Ed.2d 648 (1970), as evidencing a special concern for the sanctity of the home; consequently, it argues, the stringent standards enunciated in *Chimel* are applicable only to a search of a dwelling. The Government would have us test the legality of a warrantless search incident to an arrest outside of a dwelling under a standard of "reasonableness."

■ However, the *Chimel* formulation, limiting an incident-to-arrest search to the person and to the area within the arrestee's control, has recently been repeated with approval in a case that did not involve a building search. *United States v. Robinson*, 414 U.S. 218, 225–26, 94 S.Ct. 467, 472, 38 L.Ed.2d 427, 435 (1973). Nor is its rationale, to prevent access to weapons and destructible evidence, suited only to houses. Courts have applied it in situations analogous to this. *See United States v. Rothman*, 492 F.2d 1260, 1265–66 (9th Cir. 1973); *United States v. Colbert*, 454 F.2d 801 (5th Cir. 1972), *rev'd on other grounds*, 474 F.2d 174 (1973) (en banc). And, of course, the fourth amendment itself is not limited to dwellings.[3] *See, e. g., United States v. Van Leeuwen*, 397 U.S. 249, 90 S.Ct. 1029, 25 L.Ed.2d 282 (1970) (first-class mail search); *Rios v. United States*, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960) (package search).

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

**2.** Machado does not contest the lawfulness of his arrest, and we have no doubt that the agents had probable cause to arrest him and could do so without an arrest warrant. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598, 44 U.S.L.W. 4112 (1976); *see United States v. Race*, 529 F.2d 12 (1st Cir., 1976).

**3.** The fourth amendment provides:

■ Thus we find *Chimel* relevant, and, indeed, we know of no decision of the Supreme Court that is more relevant to the arrest situation presented here.[4] Moreover, in the area of criminal investigatory searches at least, the Supreme Court has not clearly signalled any retreat from the requirement that warrantless searches be confined to "well-delineated exceptions"— such as the arrest exception. *Katz v. United States, supra.* That requirement, coupled with the Court's explicit rejection in *Chimel* of the more flexible guidelines prevailing in the pre-*Chimel* era, see, e. g., *United States v. Rabinowitz,* 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950), rules out our adopting the Government's proposed "reasonableness" approach. The question before us is simply whether the search falls within the boundaries of the particular exception.

■ Applying *Chimel,* we find no error in the lower court's decision that the footlocker was not an area within the arrestee's immediate control. In so holding, the district court rejected the Government's attempt to analogize the footlocker search to that of hand-carried briefcases and other luggage, searches of which various courts have approved. *See Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); *United States v. Buckhanon,* 505 F.2d 1079, 1082 (8th Cir. 1974); *United States v. Maynard,* 439 F.2d 1086 (9th Cir. 1971); *United States v. Mehciz,* 437 F.2d 145 (9th Cir.), *cert. denied,* 402 U.S. 974, 91 S.Ct. 1663, 29 L.Ed.2d 139 (1971); *United States ex rel. Muhammad v. Mancusi,* 432 F.2d 1046 (2d Cir.), *cert. denied,* 402 U.S. 911, 91 S.Ct. 1391, 28 L.Ed.2d 653 (1970). The district court said,

" . . . In all of these cases, the luggage that was searched was being carried by the defendant at the time of his arrest. It may be that hand-carried luggage is encompassed in the phrase 'area within his immediate control.' But the footlocker in this case was not hand-carried luggage. . . . "

Since the decision below, this circuit has also upheld a warrantless search of a hand-carried briefcase at the scene of the arrest, after the arrestee was handcuffed and in custody. *United States v. Eatherton,* 519 F.2d 603, 610–11 (1975). However, we must agree with the district court that there is a considerable difference between items such as Eatherton's hand-carried briefcase and the footlocker here. Portable objects in hand such as zipper bags, briefcases and small suitcases, fit without too much difficulty into *Chimel's* "immediate control" standard. Their size, accessibility, and portability all liken them to "personal effects"[5] found on an arrestee's person, such as clothing or a cigarette package in one's pocket, which may lawfully be searched without a warrant as incident to an arrest. *See United States v. Robinson, supra; United States v. Edwards, supra.* To exclude searches of such items can create "gossamer thin" distinctions which arresting officers could find impracticable, if not impossible, to follow; and, where the justification for a search depends to a great extent on the reasonable judgments which the arresting officers could have made at the time of arrest, *see United States v. Robinson, supra,* those distinctions would appear unwarranted.

However, a two hundred pound footlocker is quite different. It is difficult to liken

---

4. This is, of course, not to say that the Supreme Court might never relax the "immediate control" test in the baggage search area, by reinterpretation or otherwise. But it would be speculation, and perhaps even presumption, for us to initiate such a change. Even assuming that greater flexibility is desirable to accommodate searches for contraband, it is debatable whether the arrest exception would be the best vehicle to accomplish this. *See infra.* The arrest exception does not require probable cause to search, and if the mere fact of arrest were to allow an unlimited baggage search, it might be feared that people would be arrested on technicalities in order to search all their belongings. We take no position on the matter but feel, in any event, that revisions of this sort are best left to the high Court.

5. In another setting, Chief Judge Coffin has described a briefcase as a "personal effect" that "does not clearly fall either within the realm of a personal search or a search of the premises." *United States v. Micheli,* 487 F.2d 429, 431 (1st Cir. 1973).

this footlocker to a hand-carried bag and say in any meaningful sense that the footlocker or, more importantly, its contents, were under defendants' immediate control. It was far from portable, and too heavy even to be carried by the average person. It had also, as the agents well knew, just been unloaded from a train's baggage car after a cross-country trip suggesting, as proved to be the case, that it was tightly secured and could not be opened; nor did the agents observe it open before they themselves opened it. We thus see no basis for disturbing the court's finding that, for purposes of the *Chimel* standard, "this footlocker was simply not within the control of the defendants at the time of arrest." [6]

While, as noted, we understand the Government to be relying on the search-incident-to-arrest exception, part of its argument suggests that it may also be looking in the direction of liberalized luggage search rules approved in several other circuits. These, while arising in an arrest context, draw heavily upon the rationale underlying the automobile search exception in *Chambers v. Maroney, supra*. *United States v. Mehciz, supra*; *United States v. Wilson*, No. 75–1247 (8th Cir., Oct. 21, 1975); *United States v. Buckhanon, supra*; see *United States v. Johnson*, 467 F.2d 630, 639 & n. 8 (2d Cir. 1972), *cert. denied*, 410 U.S. 932, 93 S.Ct. 1382, 35 L.Ed.2d 595, 413 U.S. 920, 93 S.Ct. 3069, 37 L.Ed.2d 1042 (1973). The courts in question would apparently allow the warrantless search of luggage for contraband upon the individual officer's determination of probable cause.[7]

It will be remembered that in *Chambers v. Maroney, supra*, the Court reaffirmed an established exception, first announced in *Carroll v. United States, supra*, allowing the warrantless search of a moving vehicle which officers had probable cause to believe held contraband. The rationale for the *Carroll* and *Chambers* exception was the likelihood that the vehicle would escape before a warrant could be secured. *Chambers* took *Carroll* a step further by allowing not only an immediate on-the-spot search but a later warrantless police station search, since, the Court reasoned, immobilization of the vehicle until a warrant could be secured was not necessarily a lesser intrusion than a warrantless search, 399 U.S. at 51–52, 90 S.Ct. at 1981, 26 L.Ed.2d at 428.

Admittedly baggage or goods in transit present some of the same characteristics as automobiles. Unless immobilized, such items may disappear before a warrant is obtained, and immobilization (a step which most courts, including ourselves, will permit, given cause), is arguably just as annoying to the owner as a search. But whatever can be said for this theory, we do not believe that it has received sufficient recognition by the Supreme Court outside the automobile area, or generally, for us to recognize it as a valid exception to the fourth amendment warrant requirement. Baggage predated automobiles, yet *Carroll* and its progeny do not mention baggage as a separate category comparable to vehicles. As we have already noted, exceptions to the warrant rule have been termed "specially established" and "well-delineated". *United States v. Katz, supra*.[8] The would-be ex-

---

6. This is not to say that even a bulky footlocker could never be such an area if, for example, there was reason for the arresting officers to believe that the arrestee had immediate access to its contents. The district court's findings on this score, are, of course, entitled to much weight.

  In holding that the footlocker search was not within the arrest exception, we do not, as the dissent would indicate, question the validity of Machado's arrest, nor do we get into any question of whether the search was unduly delayed. We simply hold that the footlocker was beyond the "area of control" that is searchable without a warrant incident to an arrest.

7. The scope and basis for the novel exception, beyond an analogy to *Chambers*, are barely spelled out in any of the cited cases. One reason that we hesitate to follow such cases is that they present no clear view of the principles to be applied.

8. Justice Powell has recently underscored this proposition, stating that "[t]here is no more basic constitutional rule in the Fourth Amendment area than that which makes a warrantless search unreasonable except in a few 'jealously and carefully drawn' exceptional circumstances." *United States v. Watson*, 423 U.S. 411, 427, 96 S.Ct. 820, 829, 46 L.Ed.2d 598, 611, 44

ception in question hardly fits that description. And we cannot be sure that the intrusion of searching an item of baggage is no greater than detaining it. As to first-class mail, the Supreme Court has held that it is greater. *United States v. Van Leeuwen, supra.* Certainly such an exception could have considerable impact, as its premises might seem to apply not only to baggage but to mail, express packages, and moving freight of all description. The *Chambers* automobile search exception itself is of a somewhat broader character than other exceptions; it does not, for example, require an accompanying arrest. The fourth amendment is "something less than a seamless web," *Cady v. Dombrowski,* 413 U.S. 433, 440, 93 S.Ct. 2523, 2527, 37 L.Ed.2d 706, 714 (1973). Standards applicable to one particular exception may not be readily translatable into another. If an exception of this character is to be translated to an entirely different class of objects, we think the Supreme Court should make the judgment.

■ We are constrained to agree, therefore, with the district court that the warrantless search of the footlocker did not fall within any recognized exception to the general warrant requirement, and that therefore the search was in violation of the fourth amendment. We would add that there was no special exigency justifying a warrantless search under the circumstances,

see *United States v. Johnson,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948). The Government does not argue that there was. The district court found that the footlocker "was not in imminent or even potential danger of being destroyed or spirited away." Doubtless, the agents had the power to detain the footlocker temporarily at their office or otherwise until a warrant could be procured. *See United States v. Brignoni-Ponce,* 422 U.S. 873, 878–82, 95 S.Ct. 2574, 2578–2581, 45 L.Ed.2d 607, 613–618 (1974); *United States v. Van Leeuwen, supra,* 397 U.S. at 252, 90 S.Ct. at 1032, 25 L.Ed.2d at 285; *Terry v. Ohio,* 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889, 902 (1968).[9] But they were not empowered to search it.

We affirm the district court's order suppressing the contents of the locker.

*Warrantless Search of the Suitcases*

The Government does not argue that in breaking open the two locked suitcases and searching them, the agents were acting pursuant to the search-incident-to-arrest exception. The district court specifically found that the suitcases were outside defendants' control at the time of arrest, and we agree.

The Government argues only that regulations of the Drug Enforcement Administration,[10] as interpreted by the agency, "mandate a complete inventory of the personal belongings of the arrested person," and that

---

U.S.L.W. 4112, 4117 (1976) (concurring), *quoting Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514, 1519 (1958). This rule is quite different from the more expansive principles applicable to warrantless arrests, which, e. g., allow a police officer to arrest solely on probable cause and without a warrant someone who has committed a felony. *Id.*

9. Government agents are given power by statute to seize contraband, 21 U.S.C. § 881. Without deciding how this statutory authority meshes with the fourth amendment warrant requirement and its exceptions, *see, e. g.,* 21 U.S.C. § 881(b)(1), it reinforces the agents' power to detain baggage at least temporarily. The Government does not contend, however, that the agents' powers under 21 U.S.C. § 881 gave them any greater authority to search than

would exist under normal fourth amendment principles.

10. Agents Manual, ¶ 6662.25. Collection and Handling of Other Personal Property:

Personal property of non-evidentiary value which is found in a seized automobile will be handled as outlined in ¶ 6654.23.

Agents Manual, ¶ 6654.23. Seizure Procedures:

Upon seizing the vehicle, it must be thoroughly searched. A search performed pursuant to civil seizure need not be contemporaneous with an arrest, and no search warrant is necessary. Remove all articles from the vehicle which are not part of the vehicle itself.

Personal property in the vehicle should be returned to the owner or the person from whom the vehicle was seized, and a receipt obtained.

compliance with such regulations was reasonable and not in violation of the fourth amendment. The district court found to the contrary. It considered the reasons advanced for the inventory—safeguarding the arrestee's personal property, insulating the agents from later claims of theft or lost property, and institutional safety—and then found,

"None of these considerations is available to justify as inventory searches the breaking into these suitcases. It is simply not credible to suggest that a closed, locked suitcase posed a threat to the institutional safety. . . . No more credible is the theory . . . that the search was necessary to protect the agents from later claims of theft or lost property. It is difficult to see how the integrity of agents is safeguarded by picking the lock to a suitcase. Such forcible entry would likely invite more, rather than fewer, claims of theft. Breaking open the suitcases (the description used by the agent who testified) was an unreasonable and, therefore, unacceptable approach to the problem."

The Supreme Court has not attempted to define generally the conditions in which inventory searches are consistent with the fourth amendment. *See Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). In inquiring into the reasonableness of the Government's actions in this case, and weighing the privacy rights of the defendants against the Government's interest in doing what it did, the court followed the approach of the eighth circuit in *United States v. Lawson,* 487 F.2d 468 (1973), and the California State courts, *see Mozzetti v. Superior Court of Sacramento County,* 4 Cal.3d 699, 94 Cal.Rptr. 412, 484 P.2d 84 (1971). That approach is somewhat at variance with the tenor of decisions in the fifth circuit which tend to validate "routine" inventory procedures unless shown to be carried out in particularly bad faith. *See, e. g., United States v. Kelehar,* 470 F.2d 176 (1972); *United States v. Lipscomb,* 435 F.2d 795 (1970), *cert. denied,* 401 U.S. 980, 91 S.Ct. 1213, 28 L.Ed.2d 331 (1971).

■■■■■ We agree generally with the approach taken in *Lawson* and find no reason to overturn the findings below. This is not to dispute the propriety of reasonable inventory procedures designed to safeguard clothing and personal effects; and if in the course of such reasonable good faith efforts an officer stumbles across incriminating evidence, the evidence will not be suppressed. *See Cady v. Dombrowski, supra ; Fagundes v. United States,* 340 F.2d 673, 675–76 (1st Cir. 1965); *cf. Cabbler v. Superintendent,* 528 F.2d 1142 (4th Cir. 1975). But just because of its designation as such, an inventory is not immune from the fourth amendment. *United States v. Lawson, supra,* 471–72. We see an inventory as occupying a middle ground between a criminal investigatory search, which must comply strictly with warrant and probable cause standards, and those actions which fall totally outside the fourth amendment. *See, e. g., Harris v. United States, supra ; Fagundes v. United States, supra.* Like the search of a code inspector, an inventory may be initiated and carried on upon a less formal basis than a criminal search and will be upheld so long as it serves a proper governmental purpose and does not amount to an excessive intrusion. *Cf. Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The test is reasonableness, and when, as here, there is a dispute, all the facts must be examined. We intimate no judgment as to the propriety of inventorying unlocked suitcases, nor even locked ones given sufficient reasons, such as suspicion that there may be explosives inside. But breaking open the two locked suitcases here was an unreasonable intrusion that exceeded any proper governmental interest shown to exist. As the court below pointed out, to protect the agents from later claims, the suitcases could have been sealed with tape which the agents could have initialled, or placed in a locked storeroom with the keys kept in an envelope along with other personal property of defendants. Forcing the

locks served no apparent purpose other than to satisfy the agent's curiosity.[11]

### Suppression of Chadwick's Conversation with the Agent

The district court suppressed Chadwick's remarks made in response to Agent Christopher's questions a few minutes after Chadwick's arrest. Chadwick was then being driven by the arresting officers to the ODALE office. He had been advised of his Miranda rights, as the court found, but, as Agent Christopher himself testified, had not expressly indicated that he waived his rights, by signing a form or otherwise. The court found (1) that Chadwick's arrest was illegal for lack of probable cause and (2) that his responses were "tainted" by the illegal arrest. On the last point, the court found that the Government had not proven a voluntary and knowing abandonment of rights, particularly as Chadwick was interrogated within a few short minutes after being illegally arrested. Relying on *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), it found the custodial interrogation to be inherently coercive "even as to one who is lawfully in custody," and even more so "where the initial arrest is illegal."

■■■■ On whether there was probable cause to arrest Chadwick, we agree with the district court that there was not. That Chadwick arrived at the station to meet the other defendants and assisted in putting the footlocker in his rented car was suspicious but fell somewhat short of being "sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). Chadwick could have been, as the district court found, a friend or relative who knew nothing of the contents of the footlocker.

Association with known or suspected criminals does not, in and of itself, establish probable cause. *Sibron v. United States*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *United States v. DiRe*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948). In a case where the facts were similar but even more indicative of guilt, the ninth circuit found no probable cause to arrest. *United States v. Jit Sun Loo*, 478 F.2d 401 (1973). *See also United States v. Linnear*, 464 F.2d 355 (9th Cir. 1972); *United States v. Bazinet*, 462 F.2d 982 (8th Cir. 1972), *cert. denied*, 409 U.S. 1010, 93 S.Ct. 453, 34 L.Ed.2d 303.

■■■■ The Government argues that because Chadwick momentarily "possessed" the footlocker, his knowing involvement in the marijuana offenses can be inferred from his possession. *United States v. Phillips*, 496 F.2d 1395 (5th Cir. 1974); *United States v. Bonham*, 477 F.2d 1137 (3rd Cir. 1973); *United States v. Palmer*, 151 U.S. App.D.C. 317, 467 F.2d 371 (1972); *People v. Reisman*, 29 N.Y.2d 278, 327 N.Y.S.2d 342, 277 N.E.2d 396 (1971); *People v. Nettles*, 23 Ill.2d 306, 178 N.E.2d 361 (1961), *cert. denied*, 369 U.S. 853, 82 S.Ct. 939, 8 L.Ed.2d 12 (1962). The district court found that, at the time of arrest, Chadwick in fact exercised no "dominion or control" over the footlocker. His contact "was less than that of a porter." This may be an overstatement: the footlocker was put in the car, and the agents could infer that Chadwick was the driver of the car although Chadwick's appearance on the scene had been entirely unexpected. Still, Chadwick's possessory interest was so slight that one cannot fairly infer knowledge of the contents from that fact. *See Leary v. United States*, 395 U.S. 6, 36, 89 S.Ct. 1532, 1548, 23 L.Ed.2d 57, 81 (1969); *cf.* 9 Wigmore on Evidence § 2491, at 288 (3d ed. 1940).[12]

---

11. The court also found that defendant's permission to open the suitcases was not sought before the locks were picked, although Agent Christopher testified that none of them claimed ownership. Nor was an inventory list ever offered to defendants. The regulations relied on are also, at best, ambiguous as to the authority for such actions. Under the circumstances, the court was entitled to entertain doubts as to the motive behind breaking into the suitcases.

12. *Cf. United States v. Race*, 529 F.2d 12 (1st Cir. 1976) (sole possession of consignee of crate reasonably believed to contain contraband held sufficient to establish probable cause to arrest).

■ The Government contends that the agents could also rely for probable cause on their policeman's noses. An agent, to be sure, is an expert of sorts, and from certain facts he may be able to derive meaning that would elude an untrained or inexperienced person. But it is one thing to credit an agent's skilled interpretation of adequate facts, and another to credit the agent's suspicions simply because the agent is an agent. Good hunches are the foundation of good police work, but they are not probable cause. The case cited by the Government, *United States v. Kancso,* 252 F.2d 220 (3d Cir. 1958), and others, *United States v. Davis,* 147 U.S.App.D.C. 400, 458 F.2d 819 (1972) and *Ortiz v. Craven,* 442 F.2d 418 (9th Cir. 1971), all presented a factual basis from which the trained observer could reasonably believe that the suspect had committed or was committing an offense. We affirm the ruling below that the arrest was illegal.

■ We also affirm the court's exclusion of Chadwick's remarks. *Wong Sun* was recently reaffirmed by *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and while the latter scarcely answers all the questions left after *Wong Sun,* it makes plain that *Miranda* warnings alone do not validate admissions secured following an illegal arrest. Here, as the district court found, the admissions were made a few short minutes after the arrest, a factor militating against admissibility, *id.* at 603, 95 S.Ct. at 2261, 45 L.Ed.2d at 426.

■ It is true that weighing in the Government's favor is the relative innocuousness of the arrest: while the agents should have known that they lacked probable cause, they had good reason to suspect Chadwick, and there is no evidence that they acted in bad faith. Still the error was not a mere technical infraction, such as Justice Powell described in his concurrence in *Brown v. Illinois,* as when officers rely on a warrant later invalidated. *Id.* at 611, 95 S.Ct. at 2265, 45 L.Ed.2d at 432. Furthermore, the district court found that Chadwick did not effectively waive his *Miranda* rights, and that consequently his admissions

were not themselves voluntary, *see Escobedo v. Illinois,* 378 U.S. 478, 490 n. 14, 84 S.Ct. 1758, 1765, 12 L.Ed.2d 977, 986 (1964), the "threshold requirement" of admissibility. 422 U.S. at 604, 95 S.Ct. at 2262, 45 L.Ed.2d at 427. This finding was perhaps not compelled in the circumstances, but it was not clearly erroneous. *Leavitt v. Howard,* 462 F.2d 992, 996 (1st Cir.), *cert. denied,* 409 U.S. 884, 93 S.Ct. 175, 34 L.Ed.2d 140 (1972). Taken together, the court's findings amount to a supported determination that the admissions were not a product of "free will" as required under *Wong Sun* and *Brown v. Illinois, supra,* at 603, 95 S.Ct. at 2261, 45 L.Ed.2d at 426. We necessarily place much reliance in these matters on the "learning, good sense, fairness and courage of federal trial judges." *Nardone v. United States,* 308 U.S. 338, 342, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939).

*Affirmed.*

THOMSEN, Senior District Judge (concurring and dissenting):

I agree that there was no sufficient justification to arrest Chadwick or Ms. Leary, that the statements Chadwick made after his arrest were properly suppressed, and that there was no justification for opening Ms. Leary's suitcase or Machado's suitcase as and when they were opened; but I respectfully dissent from that portion of the opinion which holds that opening the footlocker in the JFK building violated Machado's Fourth Amendment rights.

The information which the agents had received before the train arrived in South Station justified their suspicion that the footlocker contained contraband (a large quantity of marijuana). After Duke, the detector dog, trained to sniff out controlled substances, gave an "alert response", the agents had probable cause to believe that the footlocker contained contraband; they also had probable cause to believe that Machado, who had traveled on the same train with the footlocker and had claimed it when it was unloaded from the train and was then sitting on it, was committing a felony in their presence. They might have arrest-

ed Machado then, *United States v. Watson,* —— U.S. ——, 96 S.Ct. 820, 46 L.Ed.2d 598, 44 L.W. 4112 (1976), and did not lose that right by waiting until Machado caused the footlocker to be placed in the trunk of the automobile. I believe that the agents could also have seized and searched the footlocker in the station, after the dog gave the affirmative signal, on the ground that there was probable cause to believe that it contained contraband and was being used in committing the offense. This conclusion is supported by *United States v. Buckhanon,* 505 F.2d 1079 (8 Cir. 1974); *United States v. Johnson,* 467 F.2d 630 (2 Cir. 1972), *cert. denied,* 410 U.S. 932, 93 S.Ct. 1382, 35 L.Ed.2d 595, 413 U.S. 920, 93 S.Ct. 3069, 37 L.Ed.2d 1042 (1973); *United States v. Mehciz,* 437 F.2d 145 (9 Cir.), *cert. denied,* 402 U.S. 974, 91 S.Ct. 1633, 29 L.Ed.2d 139 (1971).

A railroad station, after the arrival of a train, is not a good place to conduct such an arrest and search, especially when the agents did not know whether one or more men might respond to the telephone call Machado had made. Nor is a street outside the station a good place to open a footlocker containing marijuana. The agents acted wisely in arresting Machado at the car, and in postponing until they arrived at JFK opening the footlocker, to confirm the fact that it contained contraband. If it had proved not to contain contraband, the agents should and presumably would have released Machado immediately. He was not hurt by the delay in opening the footlocker.

The thorough review of Fourth Amendment cases in the majority opinion herein illustrates the thicket through which state and federal judges, as well as state and federal law enforcement officers, must struggle in cases such as this. I believe that the cases cited above justify the conclusion that the principles which control the right of an officer to arrest without a warrant a person who is committing a felony in his presence in a public place should also permit the officer to open a suitcase, a footlocker or other container which he has probable cause to believe is being used to commit the offense in his presence and to seize the contraband therein.[1]

---

1. No invasion of a house or other real property was involved in this case.