USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-2151 UNITED STATES, Appellee, v. JOSE ROBLES, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Joseph L. Tauro, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Campbell, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Heidi E. Brieger, Assistant United States Attorney, with whom _________________ Donald K. Stern, United States Attorney, was on brief for appellee. _______________ John L. Roberts, by appointment of the Court, for appellant. _______________ ____________________ January 20, 1995 ____________________ CAMPBELL, Senior Circuit Judge. Defendant- _______________________ Appellant Jose Robles appeals from his conviction after a jury trial in the district court and sentence for cocaine- related offenses. We affirm in all respects. I. BACKGROUND I. BACKGROUND A. Facts A. Facts Viewed in the light most favorable to the government, see United States v. Argencourt, 996 F.2d 1300, ___ _____________ __________ 1303 (1st Cir. 1993), cert. denied, 114 S. Ct. 731 (1994), a ____________ reasonable jury could have found the following facts. In February 1992, Robles began working as a houseman at the Bostonian Hotel in Boston, Massachusetts. During his employment there, Robles befriended another houseman, co- defendant Marlio Motta. Motta then resided at 59 Blossom Street, Chelsea, Massachusetts, but he was a citizen of Colombia, where his family resided. In the fall of 1992, Robles and Motta agreed to import cocaine from Colombia to Boston by having Motta's family in Colombia conceal the cocaine within a metal cylinder and then ship the cylinder to Boston. Around November 1992, Robles and Motta invited Robles' cousin, Orlando Figueroa, to 35 Westwind Road, Dorchester, Massachusetts, an apartment leased by Robles' girlfriend, Elizabeth Diaz, and occupied, at least occasionally, by Robles. Robles and Motta asked Figueroa if he would help -2- them retrieve the cylinder by putting his name on the shipping papers as the consignee. They told Figueroa that they needed someone like Figueroa with an identification card in whose name the shipment could be sent. Robles and Motta told Figueroa that once the cocaine arrived in the United States, they wanted him to appear at the air cargo facility at Boston's Logan Airport, show his identification to Customs officials to prove that he was the consignee, and then take custody of the package. In return for his assistance, Robles and Motta offered to pay Figueroa a total of $10,000. Figueroa agreed to take part as requested. On or about December 10, 1992, the cylinder, shipped via Challenge Air Cargo from Bogota, Colombia via Miami, Florida arrived at the Continental Airlines Air Cargo Facility at Logan Airport, Boston, for a consignee identified on the shipping documents as "Orlando Figueroa" of 29 Westwind Road, Dorchester, Massachusetts. This was not Figueroa's address, but rather the address of Jose Robles' family. The cylinder was contained within a wooden crate. At about 1:00 p.m. on December 14, 1992, United States Customs Senior Inspector Lawrence Campbell, assigned to the Contraband Enforcement Team, conducted a routine inspection of the crate at Logan Airport. He noticed that the crate was coming from a country that he recognized as a -3- source country for narcotics. Campbell also took note that, according to the Challenge Air Cargo airway bill, the crate contained a metal machine part stated to be without commercial value, and shipped without insurance. In addition, Campbell noticed that the machine part was destined for a residential, rather than a commercial, address. Finally, Campbell determined that the shipping costs ($212) exceeded the declared Customs value ($150) of the item. That same afternoon, Motta, Robles, and Figueroa drove to Logan Airport in Motta's girlfriend's car to pick up the package. Robles and Figueroa entered the Continental Airlines terminal at approximately 4:45 p.m., and Robles inquired of a Continental Airlines employee, Robert Bennett, about the status of the package. Mr. Bennett told Robles that the shipment had arrived, but that it was not yet ready to be released. Mr. Bennett told Robles to return to pick it up the following day. Meanwhile, in light of what he considered to be suspicious circumstances surrounding the shipment of this package, Campbell decided to conduct further inspection. The crate was removed to the Customs Facility at Sealand in South Boston, Massachusetts in the late afternoon of December 14. There it was subjected to x-ray testing, which proved inconclusive. A drug detection dog who sniffed the crate did not alert to the presence of narcotics. Campbell then -4- manually examined the cylinder by tapping it on both ends, which sounded solid, and then by tapping it in the middle, which, he testified, produced a completely different, "hollow" sound. He then decided to drill into the cylinder to determine whether there was contraband concealed within. He first attempted to drill into the ends of the cylinder, but without success; he stated that the drill was "burning more than anything else." However, when he attempted to drill into the center of the cylinder, the drill bit "went straight through" and emerged covered with a white powdery substance. A field test of the substance was positive for the presence of "some sort of opium alkaloid." Customs agents then transported the cylinder to a machine tool shop in Norwood, Massachusetts for further examination. At approximately 8:00 p.m. on December 14, they succeeded in drilling a one-inch hole into the center of the cylinder. Over the next several hours, Customs agents extracted approximately 2.75 kilograms of cocaine from the cylinder, finally completing the job at about 1:00 a.m. on December 15. In addition, they removed a piece of carbon paper from the cylinder. From experience, they knew that carbon paper was commonly used by smugglers in order to interfere with x-ray examinations. They then poured flour and a small amount of cocaine back into the cylinder, sealed -5- it, repainted it, and repacked it into its shipping crate in orderto attempt acontrolled delivery1 tothe listed consignee. On the morning of December 15, Customs agents transported the crate containing the cylinder to the Continental Airlines Air Cargo facility. That same morning, either Robles or Figueroa contacted a friend, Luis Serrano, and asked him to drive Robles and Figueroa to the airport to retrieve a package. Robles, Figueroa, and Serrano arrived at the Continental terminal at approximately 10:55 a.m. Robles and Figueroa entered the building, and Robles inquired at the counter about the status of the package. Mr. Bennett told Robles that the package would be available for release at 1:00 p.m. that afternoon. At approximately 1:20 p.m., Robles, claiming to be Figueroa, called the Continental Air Cargo facility and asked to speak with the manager. Special Agent Protentis of the United States Customs Service, acting in an undercover capacity, took the phone call. Robles, who again identified himself as Figueroa, was informed by Protentis that the package was ready to be picked up. He informed Robles that Robles was first required to bring the necessary paperwork to  ____________________ 1. United States Customs Special Agent Timothy N. Gildea testified that a controlled delivery "is when we would allow a package with contraband or a package that had contained contraband to go to the importer so that we can trace where the package is going to and try to identify the co- conspirators." -6- the Customs officials in order to secure the package's release. Once Customs had cleared the package, he said Robles should return to the Continental Air Cargo facility with the paperwork, and then the package would be released to him. Shortly thereafter, Robles called Motta at the Bostonian Hotel. Motta told Robles to hail a taxi, and, with Figueroa, pick up Motta at the Bostonian Hotel. Robles did so. After Robles and Figueroa picked up Motta at the Bostonian, they took the taxi to the Continental freight facility at Logan, arriving at about 3:00 p.m. Robles and Figueroa entered the facility, leaving Motta in the taxi. Robles spoke to the Continental employees. He was told by them what he needed to do to clear the package through Customs. He and Figueroa then returned to the cab, which drove them to the Customs Office. At the Customs Office, Robles and Figueroa obtained clearance for release of the package, which they then took back to Continental in the cab. Once back inside the Continental freight facility, Robles arranged with Continental employees for the package to be brought to the cab. After loading the crate into the cab, Robles, Motta, and Figueroa left Logan Airport. Customs Agents intended to seize the crate and the cab's passengers following a "controlled delivery." However, the agents lost -7- sight of the taxi at some point in the Callahan Tunnel. Figueroa testified that after leaving Logan Airport the cab traveled to the rear of 35 Westwind Road, where Robles and Motta unloaded the crate into the apartment. Prior to the shipment of the package, sometime in December 1992, Motta had asked Jeff MacDonald, an engineer at the Bostonian Hotel, whether he could borrow a "Sawzall" power saw from the hotel. MacDonald agreed to lend the saw to Motta. After Robles and Motta unloaded the crate into the apartment at 35 Westwind Road, they attempted to use the saw to cut through the cylinder, but were unable to get the saw to operate properly. Unable to get to the cocaine, Robles, Motta, and Figueroa left the apartment. Also on December 15, Agent Gildea obtained a search warrant to search for cocaine and drug paraphernalia at 29 Westwind Road, the home of Robles' parents, and the home to which the crate was addressed. The search was carried out at approximately 5:30 p.m., but nothing incriminating Robles was found. On December 17, 1992, following conversations with Figueroa, law enforcement agents obtained a search warrant for the premises at 35 Westwind Road. During the execution of that search warrant on the same day, the agents seized the crate and the cylinder, which had been placed in a utility closet on the first floor of the apartment. In addition, the -8- agents found a tool box made of red-painted metal and labeled with the words "HEAVY-DUTY SAWZALL" in an upstairs utility closet. Inside the sawzall box was the power saw itself, as well as an invoice indicating that the owner of the sawzall was the Bostonian Hotel in Boston, Massachusetts. Also on December 17, law enforcement officials obtained and executed a search warrant for the premises at 59 Blossom Street, Motta's residence. During the execution of that warrant, law enforcement agents seized Motta's Columbian passport and other Columbian identification cards; a Continental Airlines Air Cargo bill for the metal cylinder shipped from Columbia to Boston; and an address book containing, among other entries, entries for "Orlando Figueroa, 29 Westwind Rd., Dorchester, Mass. 02125," and "Jochy 287-1014" (the telephone number for 29 Westwind Road). B. Proceedings Below B. Proceedings Below Robles was indicted by a federal grand jury on April 15, 1993. The indictment charged him with conspiracy to import cocaine, in violation of 21 U.S.C. 963 and 952(a); importation of cocaine and aiding and abetting, in violation of 21 U.S.C. 952 and 18 U.S.C. 2; conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. 846; and attempt to possess cocaine with intent to distribute and aiding and abetting, in violation of 21 U.S.C. 846 and 18 U.S.C. 2. -9- On July 27, 1993, the district court denied Robles' motion in limine seeking to exclude evidence of Robles' prior _________ drug activities. In addition, the district court denied Robles' motions to suppress certain physical evidence. With respect to the cocaine seized from the cylinder, the court, without a hearing, ruled that Customs agents had conducted a routine border search, and accordingly had lawfully searched the cylinder without a warrant. With respect to the tool box and power saw seized from 35 Westwind Road, the court, after a brief hearing, ruled that Robles had standing to challenge the warrant because his girlfriend lived in the apartment. However, it also ruled that the tool box and power saw were lawfully seized because they were in plain view during the execution of a valid search warrant. On July 28, 1993, the court denied Robles' motion for a judgment of acquittal. On July 30, 1993, after a five- day trial, the jury convicted Robles on each count of the indictment, and the court imposed sentence on September 24, 1993. Judgment was entered on October 7, 1993, from which this appeal was taken. II. II. A. Denial of a Motion to Suppress Evidence Seized as the A. Denial of a Motion to Suppress Evidence Seized as the Result of a Nonroutine, Warrantless Border Search Result of a Nonroutine, Warrantless Border Search Robles contends that the district court erred in denying his motion to suppress evidence seized as a result of the drilling search of the metal cylinder. He concedes that -10- Logan Airport was the functional equivalent of an international border, and that the agents were entitled to conduct a routine border search of the cylinder without a warrant, probable cause or any level of suspicion. But Robles contends that drilling into the cylinder went beyond the limits of the usual routine border search. To justify such a nonroutine search, there had to be reasonable suspicion. Because reasonable suspicion was absent, Robles continues, the drilling was improper. To hold otherwise, he urges, would be to subject "international cargo to destructive searches, in cases without reasonable suspicion and exigent circumstances, and absent review by an impartial judicial officer." The government concedes that drilling a hole in the cylinder was nonroutine. The government also accepts that damaging border searches of this nature cannot be conducted except upon a showing of reasonable suspicion. But the government insists that the suspicious circumstances surrounding the crate and the enclosed cylinder fully met that standard. Where, as here, the district court made no findings of fact with respect to its denial of the motion to suppress, this court reviews the record de novo. United States v. _______ ______________ Garcia, 983 F.2d 1160, 1167 (1st Cir. 1993); United States v. ______ _____________ Sanchez, 943 F.2d 110, 112 (1st Cir. 1991). We are not bound _______ -11- by the district court's reasoning, and will affirm if the ruling below is supported by any independently sufficient ground. Garcia, 983 F.2d at 1167; United States v. ______ ______________ McLaughlin, 957 F.2d 12, 16 (1st Cir. 1992); United States v. __________ _____________ Bouffard, 917 F.2d 673, 677 n.7 (1st Cir. 1990). ________ It is well-settled, as the parties all concede, that routine border searches, conducted for the purposes of collecting duties and intercepting contraband destined for the interior of the United States, do not require reasonable suspicion, probable cause, or a warrant. United States v. _____________ Montoya de Hernandez, 473 U.S. 531, 537-38 (1985); see also ____________________ ________ United States v. Ramsey, 431 U.S. 606, 616-619 (1977) ______________ ______ (routine border searches are reasonable within the meaning of the Fourth Amendment); United States v. Braks, 842 F.2d 509, _____________ _____ 511 (1st Cir. 1988) (routine border searches not subject to any requirement of reasonable suspicion). The rule as to nonroutine border searches is, however, different. There must be reasonable suspicion before a search can lawfully be conducted. In the Braks case _____ we listed factors used to determine what degree of invasiveness or intrusiveness would render a border search nonroutine. These factors include "whether force is used to effect the search." Braks, 842 F.2d at 512.  _____ Drilling into a closed, metal cylinder, as here, was using "force . . . to effect the search." Id. Cf. ___ ___ -12- United States v. Chadwick, 532 F.2d 773, 783 (1st Cir. 1976) ______________ ________ (breaking into locked suitcases), aff'd, 433 U.S. 1 (1977), _____ cited in Braks, 842 F.2d at 512 n.9. As Customs Inspector ________ _____ Campbell conceded, drilling was "for the most part" unusual, and "not an everyday occurrence." We have little difficulty concluding that drilling a hole into the cylinder was not a routine search. Customs agents, as already said, must have a "reasonable" level of suspicion before conducting such a nonroutine border search. To satisfy the reasonable suspicion standard, agents must "demonstrate some objective, articulable facts that justify the intrusion as to the particular person and place searched." United States v. _____________ Uricoechea-Casallas, 946 F.2d 162, 166 (1st Cir. 1991) ___________________ (citing Braks, 842 F.2d at 513). _____ We agree with the government that this standard was met here. The shipping documents, which the agents examined, indicated that the shipment contained a metal machine part of no commercial value, coming without insurance from Columbia a known source country for narcotics to an apparent residence, rather than to a business. From the documents it appeared that the shipping cost exceeded the cylinder's declared value. Tapping the cylinder in the middle produced a "completely different" hollow sound from the way tapping the solid ends had sounded, suggesting the presence of a -13- hollow compartment within. Quite obviously, such a compartment could be used to transport contraband, as proved to be the case. Given the cylinder's lack of commercial value, its residential destination, and the fact that to ship it cost more than its value, the agents reasonably suspected that the hollow cylinder was not being shipped for its own sake but rather was being employed to import contraband from Columbia into this country. The above objective facts, which the agents learned in the course of their routine preliminary search, were sufficient to justify the more intrusive search, by drilling, which the Customs officials then initiated.2 We affirm the district court's denial of the motion to suppress evidence derived from the search and seizure of the cylinder. B. Denial of a Motion to Suppress Evidence Seized without a B. Denial of a Motion to Suppress Evidence Seized without a Warrant from a Home Warrant from a Home Robles next contends that the denial of his motion to suppress a tool box and the power saw within items seized from his girlfriend's home at 35 Westwind Road was error. Our above holding defeats Robles' first reason  ____________________ 2. Robles cites United States v. Cardona-Sandoval, 6 F.3d 15 _____________ ________________ (1st Cir. 1993) (involving a destructive, "stem-to-stern" search of a pleasure craft) in support of his argument that none of the facts mentioned above were objective facts. We _________ disagree. The written statements in the shipping documents, the country of origin of the cylinder, and the sounds produced by tapping on the cylinder were all objective, and were sufficient to raise a reasonable suspicion at the close of the preliminary routine inspection. -14- offered in support of this claim namely, that since the warrantless border search which provided probable cause for the search of the apartment was supposedly illegal, any evidence seized as a result was "fruit of the poisonous tree." As just held, the search of the cylinder was not illegal. Robles further argues, however, that seizure of the tool box and power saw was illegal because neither item was mentioned in thewarrant tosearch the 35Westwind Roadpremises. The search warrant authorized seizure of (1) a wooden crate addressed to Figueroa; (2) the cylinder; (3) all papers relating to the shipping of the crate and the cylinder; (4) all papers or photographs relating in any way to the defendants; and (5) all documents evidencing dominion or control of the premises. Nothing was said as to a tool box or saw. The government contends, however, that the tool box, with the saw within, was evidence in "plain view" for which a warrant was not required. Law enforcement agents may seize evidence in plain view during a lawful search even though the items seized are not included within the scope of the warrant. Coolidge v. ________ New Hampshire, 403 U.S. 443, 465 (1971); United States v. _____________ ______________ Caggiano, 899 F.2d 99, 103 (1st Cir. 1990); United States v. ________ _____________ Rutkowski, 877 F.2d 139, 140 (1st Cir. 1989). To fall within _________ the "plain view" doctrine, a seizure must satisfy two criteria: first, the officers' presence at the point of -15- discovery must be lawful, and second, the item's evidentiary value must be immediately apparent to the searchers. United ______ States v. Giannetta, 909 F.2d 571, 578 (1st Cir. 1990).3 ______ _________ The seizure of the tool box meets these criteria. The agents were lawfully on the premises at 35 Westwind Road, pursuant to a valid search warrant. Once there, the agents were authorized to look within the utility closet (where the tool box was found) in order to search for papers, photographs and other documents. As the Supreme Court has noted: A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found. United States v. Ross, 456 U.S. 798, 820-21 (1982) (footnote _____________ ____ omitted). Finally, the tool box was labelled on its side with the words "HEAVY-DUTY SAWZALL." Since the officers knew that cocaine had been concealed within a heavy metal cylinder, which must perforce be opened in some manner in  ____________________ 3. Courts also historically have required that the discovery of the item be inadvertent -- i.e., that the searching agents not suspect in advance that they would find the item. However, the Supreme Court has stated that "inadvertence" is not a necessary condition of a plain view seizure. See ___ Horton v. California, 496 U.S. 128, 130 (1990). ______ __________ -16- order to remove the cocaine, the evidentiary value of a saw capable of performing that task was readily apparent. The box was thus properly seized as evidence in plain view. As Ross, supra, makes clear, there was also no ____ _____ unlawfulness in opening the tool box to search its contents.4 Quite apart from its own evidentiary value, the box was a possible repository for items mentioned in the warrant, such as papers, documents and photographs, of which seizure was authorized. Just as the agents could open closets, chests, doors and other containers, in order to look for these, they were authorized to open the box for that purpose. Once the box was opened, the evidentiary value of the power saw found within was obvious. We find no error in the district court's denial of Robles' motion to suppress as evidence the tool box and power saw seized from 35 Westwind Road.  ____________________ 4. Texas v. Brown, 460 U.S. 730 (1983), upon which Robles _____ _____ relies for the proposition that even if the seizure of the tool box was lawful, the subsequent search of its contents was not, is not to the contrary. That case involved the warrantless seizure of a balloon containing heroin. Justice Stevens stated that where a movable container is in plain view, it could be seized without a warrant if there were probable cause to believe it contained contraband. However, he continued, once in custody there was no reason to fear destruction of the evidence, and thus there was no reason to excuse the inconvenience of obtaining a warrant before opening the container. Id. at 749-50 (Stevens, J., ___ concurring). Here, as we have noted, the officers were armed with a warrant with authorized them to open a wide variety of containers in order to search for papers. There was no need to wait to obtain a separate warrant before opening the tool box. -17- C. Conclusion C. Conclusion Robles challenges certain of the district court's evidentiary rulings on a variety of other grounds, claiming unfair prejudice, likelihood of confusion, lack of authentication and the admission of inadmissible opinion testimony. Robles also challenges the denial of his motion in limine to exclude testimony as to prior bad acts; the __________ court's jury instructions; the sufficiency of the evidence; the application of the sentencing guidelines; and the effectiveness and competence of defense counsel. None of these claims of error call for extended discussion here. We have carefully considered each of them and we find them to be without merit. Affirmed. ________ -18-