**UNITED STATES of America, Plaintiff,**

v.

**Sergio CARABALLO, et al., Defendants.**

**Crim. No. 95–357 (PG).**

United States District Court,
D. Puerto Rico.

March 4, 1996.

Sonia Torres, Asst. U.S. Attorney, Hato Rey, P.R., for Plaintiff.

Rafael González Vélez, Santurce, P.R., for Defendants.

## OPINION AND ORDER

PEREZ–GIMENEZ, District Judge.

Before the Court is co-defendant Caraballo's motion to suppress. For the reasons stated herein, the motion is GRANTED.

The evidence seized from Caraballo will be inadmissible as evidence of guilt in the trial against him.

## I. Facts

The facts, as developed at the February 9, 1996 hearing, are as follows: On the morning of September 30, 1995, Customs Inspectors detained Kevin A. Droz–Rios ("Droz"), a co-defendant in this case, as he disembarked the cruise ship "Fascination." (The Fascination had recently arrived in Puerto Rico after a stop in Aruba, though the record does not reflect exactly when.) The agents discovered 1.1 kilograms of heroin and almost 1.7 kilograms of cocaine concealed on Droz' person and hidden in his belongings.

Droz quickly agreed to cooperate with government investigators. This cooperation led to the apprehension of another co-defendant, Ramón Del Valle Rodriguez. Also through Droz' cooperation, the government learned of the involvement of Sergio Caraballo ("Caraballo"), who Droz knew at the time only as Sergio, and as a crew-member of the Fascination. Droz maintained that he and Caraballo had procured the drugs together in Aruba, and that Caraballo had left the dock area earlier that morning in a taxi. Droz stated that he and Caraballo were to meet at 3:00 p.m. that afternoon with a third party at a restaurant-bar in Old San Juan ("Hooters") to receive payment for the importation of the drugs. The agents obtained a photograph of Caraballo from the Fascination's security officers, which Droz confirmed as the person he knew as "Sergio."

At the appropriate time, Customs agents proceeded to Hooters where they discovered Caraballo already present with several other persons. He was carrying a bag with an identifiable logo. Shortly thereafter, Caraballo left Hooters and proceeded toward the pier where the Fascination was docked. Caraballo proceeded up the gangway toward the boat, into the customs enclosure area. He entered a bathroom, and then exited toward the street. Shortly thereafter, Customs agents arrested him and escorted him back into the enclosure area, into an inspection room. The agents emptied the contents of his bag, discovering four shoe implants

**140**

(similar to items seized from Droz). The agents "probed," i.e., drilled into, the implants, discovering over a kilogram of cocaine. Caraballo moves to suppress this evidence on the grounds that the government's search of his belongings without a search warrant violated the Fourth Amendment.

## II. Discussion

■ It is well established that routine border searches, conducted for the purposes of collecting duties and intercepting contraband, do not require reasonable suspicion, probable cause, or a warrant.. *United States v. Robles,* 45 F.3d 1, 5 (1st Cir.1995) (citations omitted). The rule does not so much represent a relaxation of the Fourth Amendment as it does a different conception of what constitutes an "unreasonable search[ ] and seizure[ ]" in the context of attempting to enter the United States. *United States v. Ramsey,* 431 U.S. 606, 616–22, 97 S.Ct. 1972, 1978–81, 52 L.Ed.2d 617.[1] "The border-search exception is grounded in the recognized right of the sovereign to control ... who and what may enter the country." *Id.* at 620, 97 S.Ct. at 1980.

■ The rule as to *nonroutine* border searches, however, is somewhat different. "There must be reasonable suspicion before a [nonroutine border] search can lawfully be conducted." *Robles,* 45 F.3d at 5. Nonetheless, a search warrant is not required even for a nonroutine border search. Without addressing all the considerations that factor into the determination, the difference between a routine and nonroutine search depends on the degree of intrusiveness of the search. *Id.* The Court finds that the probing of Caraballo's shoe implants was, unquestionably, a nonroutine search. *See id.*

■ Whether the search was "routine," or not, however, is immaterial. The sole question presented by Caraballo's motion is whether the search of his belongings occurred during a "border search" and, therefore, was legally done without a search warrant. (Recall that both routine and nonroutine searches may be conducted without a warrant.) It is clear that Droz' statements regarding Caraballo's involvement were sufficient, in and of themselves, to create a reasonable suspicion regarding Caraballo. In fact, based on that information, the agents undoubtedly had probable cause to support a search warrant for Caraballo and his belongings. The question is whether they were constitutionally required to obtain one. The agents' reasonable suspicion notwithstanding, the warrantless search was unconstitutional unless it was a *bona fide* border search. *See Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (warrantless searches are *per se* unreasonable unless falling within one of the few well established exceptions to the Fourth Amendment's Warrant Clause).

■ The government makes two, alternative, arguments for the admissibility of the evidence seized from Caraballo. First, that when Caraballo returned to the Fascination in the afternoon, he "cross[ed] the functional equivalent of the border," and, therefore, was properly searched pursuant to the border search doctrine. Additional Arguments in Opposition to Caraballo's Motion to Suppress, Dkt. # 51, at 2. To appreciate why this argument is meritless, we must reconsider the policy behind the border search exception, especially as applied to customs inspections at docks and airports—places which are not literally the border.

■ Customs areas at docks and airports have been construed by the courts as the "functional equivalent" of borders because of administrative necessity. *Almeida–Sanchez v. United States,* 413 U.S. 266, 273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). There is simply no other way to achieve the policy which justifies the border search doctrine, i.e., "to control ... who and what may enter the country." *Ramsey,* 431 U.S. at 620, 97 S.Ct. at 1980. Thus, it is clear that a border search need not take place at the actual border. However, once a passenger exits the plane or boat that brought him to the United

1. *Ramsey* upheld the constitutionality of 19 U.S.C. § 482, the statute authorizing customs agents and their designees to conduct warrantless searches of vessels, cargo and persons entering the United States if agents have "reasonable cause to believe" that such entry violates the law.

States, passes through customs, and goes on his way, the fiction is over. The customs area loses its quality as the functional equivalent of a border for the departed passenger and simply becomes one more government office. To hold otherwise would essentially mean that the customs enclosure area between a docked boat and the shore is a permanent zone of lesser Fourth Amendment protection. Any person passing from the shore to the boat could be seized and her belongings searched without a warrant as if the gangway constituted an international border. Because this would be untenable, the government's first argument must fail.

 Alternatively, the government argues that the search should be upheld pursuant to the "extended border search doctrine." This doctrine provides a framework for assessing the constitutionality of searches which, although directed at a person or thing known to have recently crossed the border, occurs after some appreciable time has passed since that entry was effected. Wayne R. LaFave, 4 *Search and Seizure: A Treatise on the Fourth Amendment, 2d Ed.* § 10(f) at 741.

Professor LaFave identifies the leading case as *Alexander v. United States,* 362 F.2d 379 (9th Cir.1966), which involved the search of a vehicle some time after it crossed the Mexico border into Arizona. In concluding that the search of the car was permissible without a warrant, the *Alexander* court stated:

> Where, however, a search for contraband by Customs officers is not made at or in the immediate vicinity of the point of international border crossing, the legality of the search must be tested by a determination whether the totality of the surrounding circumstances, including the time and distance elapsed as well as the manner and extent of surveillance, are such as to convince the fact finder with reasonable certainty that any contraband which might be found in or on the vehicle at the time of search was aboard the vehicle at the time of entry into the jurisdiction of the United

States. Any search by Customs officials which meets this test is properly called a "border search".

*Id.* at 382–83. In accord with *Alexander,* the case cited by the government characterizes the "elements" of a legitimate extended border search as follows: "[T]he government must prove [1] that the object searched crossed the border, [2] that its condition remained unchanged between the time of crossing and the time of the search, and [3] that there was reasonable suspicion at the time of the search that the object was involved in criminal activities." *United States v. Garcia,* 672 F.2d 1349, 1367 (11th Cir. 1982).

When the criteria for a constitutionally permissible "extended border search," as explained in *Alexander* and *Garcia,* are compared with what occurred here, it is clear that the government's conduct cannot stand. Caraballo left the Fascination sometime in the morning of September 30 and was not located by the government until approximately 3:00 p.m. that afternoon. Thus, the government cannot prove that the condition of the items seized from Caraballo and subsequently searched (1) crossed the border, let alone (2) remained unchanged between the time of crossing and the time of the search. During the six hours Caraballo spent ashore, unobserved, he had ample opportunity to obtain drugs independent of any he may have procured in Aruba. Thus, it is irrelevant that "the agents ... maintained continuous surveillance of the defendant and the bag from the time he left Hooters until the time he departed the U.S. Customs Enclosure are and was stopped." Government's Additional Arguments at 2–3. What matters is the government's ability to establish continuity from the initial border crossing until Caraballo was stopped, which the government does not allege it can do. It is immaterial that a *post hoc* evaluation of the evidence suggests that the items seized from Caraballo were identical to those seized from Droz— which were unequivocally imported from Aruba.[2]

**2.** Comparing the situation here with that in *Alexander* suggests that the considerations which led

the court to admit the evidence in that case are simply not present here:

142

Thus, under either theory advanced by the government, the Customs agents' warrantless search of Caraballo's belongings cannot be constitutionally validated as falling under the border search exception to the warrant requirement. The facts suggest that the government had ample time, and sufficient probable cause, to obtain a search warrant prior to detaining Caraballo. Alternatively, the agents could have obtained a warrant after arresting him. From the Court's hindsight perspective, it is clear that they should have done so.

**THEREFORE,** Caraballo's motion to suppress (Dkt. # 36) is **GRANTED.**

**IT IS SO ORDERED.**

In the case at bar, the vehicle was placed under surveillance by Customs officers when it crossed the border and, except for a period of "possibly a minute to two minutes" when lost from view, was kept under constant watch as it made suspicious movements about the streets of Nogales, Arizona. Since the evidence discloses no reason to believe that there was any change of condition of the auto from the time it crossed the border until it was stopped, the fact that the vehicle was lost from view of the Customs officers for a brief period of time does not alter the character of the search as a "border search".

*Alexander,* 362 F.2d at 382–83 (internal citations and punctuation omitted).