# United States Court of Appeals
## For the First Circuit

No. 13-1494

UNITED STATES OF AMERICA,

Appellee,

v.

JORGE L. MOLINA-GÓMEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Torruella, Lipez, and Barron,
Circuit Judges.

Leonardo M. Aldridge-Kontos, Assistant Federal Public
Defender, with whom Héctor E. Guzmán-Silva, Jr., Federal Public
Defender, Héctor L. Ramos-Vega, Assistant Federal Public Defender,
and Liza L. Rosado-Rodríquez, Research and Writing Specialist, were
on brief, for appellant.
Juan Carlos Reyes-Ramos, Assistant United States Attorney,
with whom Rosa Emilia Rodríquez-Vélez, United States Attorney, and
Nelson Pérez-Sosa, Assistant United States Attorney, Chief,
Appellate Division, were on brief, for appellee.

March 20, 2015

**TORRUELLA, Circuit Judge**.   Jorge   L.   Molina-Gómez ("Molina") appeals the district court's order denying his motion to suppress both the heroin discovered in hidden compartments of his laptop computer and Sony Playstation game console and some of the statements he made to United States Customs and Border Protection ("CBP") officers upon returning to Puerto Rico from Colombia. While we find no Fourth Amendment violation, Molina's statements made   during   further   secondary   questioning   regarding   drug trafficking activity should have been suppressed.  As a result, his case must be remanded so that he can opt to withdraw his plea and proceed to trial should he choose to do so.

## I.  Background[1]

On August 6, 2012, at approximately 11:00 p.m., Molina arrived at the Luis Muñoz Marín International Airport in San Juan, Puerto Rico, via Panama, after a five-day trip to Colombia.  This was the third time in four months in which Molina had taken a short trip to Colombia, a known source of illegal narcotics.  As a result, the CBP computer system flagged Molina for questioning.

Upon   deplaning,   Molina   was   referred   to   secondary inspection, where he claimed one carry-on bag, one computer case

---

[1]   Because this appeal follows a guilty plea, we draw the facts from the change-of-plea colloquy and the presentence investigation report, United States v. Cintrón-Echautegui, 604 F.3d 1, 2 (1st Cir. 2010), supplementing where necessary from the United States Immigration and Customs Enforcement ("ICE") Investigation Report. Notably, the parties do not dispute many of the material facts.

holding an ACER laptop computer, and one small bag containing a Sony Playstation. The carry-on bag contained personal belongings, three cell phones, and a Western Union money gram in the amount of one million Colombian pesos (approximately $560) sent to Molina at the Hotel Galaxy the day after he arrived in Colombia by a Colombian man named Rodolfo Trochez Sardí.

In response to the CBP officers' questions, Molina explained that he traveled to Cartagena, Colombia, for four days to visit a friend, "Camilo," whom he met through another friend named Cynthia. He stated that he purchased his ticket for $500 on the COPA Airlines website using a credit card, but that he did not have the credit card with him. Molina told the CBP officers that while in Colombia he stayed at the Hotel Galaxy and did not leave his hotel room, but rather just ate and played games on his Playstation.

These answers raised the CBP officers' suspicions, and further questioning and investigation revealed problems with Molina's story. For example, Molina did not know either Camilo or Cynthia's last name. And, contrary to his assertion, Molina did not purchase his plane ticket online via credit card, but rather it was purchased in cash at a Cali, Colombia travel agency. Indeed, all three of Molina's Colombian trips were booked with cash through this travel agency.

Molina was then escorted to a small (approximately ten-foot-by-ten-foot), windowless room containing one desk where he was patted down and subjected to further secondary questioning. He was in this room for approximately two hours and was asked about his trip to Colombia, his intentions upon reentry, and drug trafficking generally. The record is unclear as to what specifically the CBP officers asked and what Molina's responses were. He did, however, tell the officers that he had to work the following morning at 8:00 a.m., and he denied any involvement in drug trafficking.

While this questioning was ongoing, other CBP officers were inspecting Molina's belongings. They X-rayed his laptop, Playstation, and three cell phones and saw no contraband. They also confirmed that the electronics were all operational, but noted that while the laptop turned on, it contained no data despite being an older model. A review of the three cell phones showed text messages from Camilo, Sardí, and numerous unidentified others. These text messages involved money transactions totaling approximately $8,000 and referenced money Molina had already received and money he would receive once he arrived in New York. The phones also revealed a confirmed plane ticket from San Juan to New York for 9:35 the following morning, contradicting Molina's statement to CBP officers that he would be working in San Juan at 8:00 a.m.

Given all of these red flags, the officers suspected that Molina was smuggling narcotics. Because the pat-down yielded no results and the X-ray of Molina's electronics came back negative, the officers were concerned that Molina was carrying drugs internally. They explained the situation to Molina, and he voluntarily consented to a medical exam. At around 1:45 a.m., Molina was taken, in shackles,[2] to San Gerardo Hospital. An X-ray exam was inconclusive, so a CT scan was performed and his bowel-movements were monitored. These tests confirmed that there were no foreign objects inside Molina's body. Later that day, at around 6:00 p.m., he was released from the hospital and transported back to the airport.

Upon returning to the airport, Molina was released by CBP and allowed to enter the United States. He was given all of his belongings except for the laptop and Playstation, which were detained for further examination by the CBP Forensics Laboratory because a dog-sniff "showed interest" in the laptop. Molina was given a pamphlet explaining the electronic-device detention process and whom to contact to inquire about the property.

The following day, August 8, the laptop and Playstation were received by the CBP Forensic Lab. The detention ticket

---

[2] Molina was not handcuffed or restrained during his initial questioning or during the inspections of his belongings. It is unclear whether he was handcuffed during the further two-hour questioning in the small, windowless room.

-5-

indicated that the detention was for "data extraction" but this was in error, as the electronics were detained in order to be searched for hidden contraband. Indeed, no data extraction was ever conducted. Beginning on August 11, Molina started calling the CBP to inquire about the status of his electronics and when they would be returned. On August 24, a CBP forensic chemist disassembled the electronics and found black bags hidden inside sophisticated compartments of both the laptop and Playstation. The bags' contents tested positive for heroin -- 511 grams in the laptop and 1.05 kilograms in the Playstation.

On August 28, CBP, in coordination with ICE, called Molina to inform him that his electronics could be picked up at the airport. When Molina arrived later that day, he was arrested by ICE agents. The agents read Molina his rights, which Molina subsequently waived. He confirmed that he owned both the laptop and the Playstation, that he took them to Colombia and intended to return with them, that he had planned to travel to New York the morning after he returned to Puerto Rico but never did so, and that his trip to Colombia and New York were paid for by Sardí.

Molina was indicted for possession with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(A)(i), in September 2012. In December 2012, he filed a motion to suppress the heroin and any statements made during the further secondary questioning as violations of his

Fourth and Fifth Amendment rights, respectively.  The motion was denied via a brief text order, which stated in its entirety:

> I am of the opinion that the position advanced by the government in the opposition to the motion to suppress is correct as a matter of law.  The Motion to Suppress is denied.  If the defendant pleads, he may preserve the issue on appeal.

Three days later, Molina entered a conditional plea pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure,[3] and he now timely appeals the denial.

---

[3]  The rule states:

> With the consent of the court and the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion.  A defendant who prevails on appeal may then withdraw the plea.

Fed. R. Crim. P. 11(a)(2).  As there was no written plea agreement in this case, Rule 11(a)(2) was technically violated.  However, Molina, the government, and the district court all understood that the plea was conditional upon Molina's right to appeal the suppression ruling.  This was explicitly stated in the text order denying the motion to suppress and again at the change of plea hearing.  Thus, the violation is excused under Rule 11(h) as a harmless error.  See Fed. R. Crim. P. 11(h) ("A variance from the requirements of this rule is harmless error if it does not affect substantial rights.").  Other courts faced with this issue have likewise found a conditional plea valid despite the technical violation.  See, e.g., United States v. Santiago, 410 F.3d 193, 197-98 (5th Cir. 2005); United States v. Markling, 7 F.3d 1309, 1313 (7th Cir. 1993).

## II.  Discussion

### A.  Standard of Review

"We review the [district] court's findings of fact for clear error and review de novo its conclusions of law and its rulings on the constitutionality of the government's conduct." United States v. Beras, 183 F.3d 22, 25 (1st Cir. 1999); see also United States v. Carrigan, 724 F.3d 39, 45 (1st Cir. 2013) (Fourth Amendment); United States v. Mittel-Carey, 493 F.3d 36, 39 (1st Cir. 2007) (Fifth Amendment).  Because the district court made no findings of fact, the entire record is reviewed de novo.  United States v. Robles, 45 F.3d 1, 5 (1st Cir. 1995).  So long as "any reasonable view of the evidence supports it," we will uphold the denial of the motion to suppress.  United States v. Brown, 510 F.3d 57, 64 (1st Cir. 2007) (internal quotation marks and citation omitted).

### B.  The Search of the Electronics

Molina first argues that the search of his laptop and Playstation, which uncovered the hidden heroin, was an unreasonable search in violation of the Fourth Amendment to the United States Constitution.  Pursuant to the Fourth Amendment,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  It is well established, however, that "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior" due to the "longstanding concern for the protection of the integrity of the border."  United States v. Montoya de Hernández, 473 U.S. 531, 538 (1985).  This concern is, "if anything, heightened by the veritable national crisis in law enforcement caused by smuggling of illicit narcotics."  Id.  As a result, there is a recognized "border search exception" to the warrant requirement.  See United States v. Ramsey, 431 U.S. 606, 619-22 (1977); see also Montoya de Hernández, 473 U.S. at 538; Beras, 183 F.3d at 25-26. International airports such as the Luis Muñoz Marín International Airport are the "functional equivalent" of an international border and are thus subject to this exception.  Robles, 45 F.3d at 5; United States v. Uricoechea-Casallas, 946 F.2d 162, 164 (1st Cir. 1991).

Under the border search exception, "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." Montoya de Hernández, 473 U.S. at 538; see also United States v. Braks, 842 F.2d 509, 514 (1st Cir. 1988) ("The First Circuit standard for routine border searches is the 'no suspicion' standard.").  These searches "are reasonable simply by virtue of the fact they occur at the border."  United States v. Flores-

Montano, 541 U.S. 149, 152-53 (2004) (quoting Ramsey, 431 U.S. at 616). Non-routine searches, by contrast, require reasonable suspicion. Montoya de Hernández, 473 U.S. at 541-42; United States v. Barrow, 448 F.3d 37, 41 (1st Cir. 2006). Though there is no hard-and-fast rule, and the Supreme Court has cautioned against "[c]omplex balancing tests," Flores-Montano, 541 U.S. at 152, whether a search qualifies as "routine" or "not routine" often depends on the "degree of invasiveness or intrusiveness associated with" the search. Braks, 842 F.2d at 511-12 (listing numerous factors to consider). For example, searches that are "highly intrusive searches of the person," Flores-Montano, 541 U.S. at 152, such as strip searches and body cavity searches, have been deemed to be non-routine. E.g., id.; Barrow, 448 F.3d at 41; Braks, 842 F.2d at 512-13; United States v. Kallevig, 534 F.2d 411, 413-14 (1st Cir. 1976). So have searches of property that are "destructive," Flores-Montano, 541 U.S. at 155-56, such as drilling a hole in a metal cylinder. Robles, 45 F.3d at 5. By contrast, pat-downs, Braks, 842 F.2d at 513, searching luggage inside an aircraft's cargo hold, Uricoechea-Casallas, 946 F.2d at 165, opening bottles of liquor and testing the contents, Barrow, 448 F.3d at 41, and removing, disassembling, and reassembling a fuel tank without causing damage, Flores-Montano, 541 U.S. at 154-55, have all been deemed routine searches.

Here, Molina argues that the search of his laptop and Playstation that led to the discovery of the two heroin bags constitutes a non-routine and unreasonable search. However, he is unable to point to any specific act that is either non-routine or unreasonable. Instead, his argument seems to be that because the initial X-ray and search of his laptop and Playstation turned up negative, and because his eighteen-hour detention at the hospital (to which he consented) showed that he was not carrying drugs internally, it was therefore unreasonable to detain his laptop and Playstation for further testing. And, even if it was reasonable to further detain the electronics initially, he contends, the detention became unreasonable during the twenty-two days they were at the CBP lab. The government, for its part, counters that the search qualifies as a routine border search and thus no suspicion at all -- let alone reasonable suspicion -- was necessary, but even if reasonable suspicion was necessary, that standard was satisfied.

We need not categorize the search as either routine or non-routine because we agree with the government that even assuming the search was non-routine, reasonable suspicion existed to justify the search. Reasonable suspicion exists when agents "demonstrate some objective, articulable facts that justify the intrusion as to the particular person and place searched." Robles, 45 F.3d at 5 (quoting Uricoechea-Casallas, 946 F.2d at 166); see also Montoya de Hernández, 473 U.S. at 541-42 (describing reasonable suspicion as

-11-

a "common-sense conclusio[n] about human behavior upon which practical people, -- including government officials, are entitled to rely" (alteration in original) (quoting New Jersey v. T.L.O., 469 U.S. 325, 346 (1985)) (internal quotation marks omitted)).

Such objective, articulable facts are present here. First, this was Molina's third trip in four months (each only for a matter of days) to Colombia, a country known for its connection to drug smuggling. Second, Molina gave odd and suspicious answers to routine Customs questions. These answers ranged from highly dubious -- (1) he could not remember the last name of either the friend he was visiting (Camilo) or the friend who introduced them (Cynthia); and (2) all he did while in Colombia was stay in the hotel and play with his Playstation -- to assertions proven to be flat-out lies -- (3) he claimed to have purchased his ticket online with a credit card but in actuality paid for it in cash at a travel agency; and (4) he claimed to be working in Puerto Rico the next morning but in fact had a confirmed flight to New York City. Third, his laptop was old and operational, yet it contained no data. Finally, his phones contained text messages involving prior and future money transactions. Taken together, these facts easily give rise to a reasonable suspicion that Molina was attempting to smuggle narcotics. See Robles, 45 F.3d at 5 (holding that reasonable suspicion existed where a metal machine part of no commercial value was shipped "from Colombia -- a known source

-12-

country for narcotics" to a residence in the United States at a cost higher than its worth, without insurance); United States v. Lamela, 942 F.2d 100, 102 (1st Cir. 1991) (finding reasonable suspicion where defendant, among other things, "was a passenger aboard an international flight originating in Colombia" and "gave inconsistent responses to routine questions relating to the purpose of his travel"); Kalleviq, 534 F.2d at 414 (explaining that the "pattern and brevity of [defendant's] recent visits to countries considered to be important sources of drugs" was "properly noted" as a relevant factor in evaluating reasonable suspicion).

That the initial X-ray of the electronics and the X-ray, CT scan, and bowel monitoring of Molina came up negative in no way alters this conclusion or transforms a legitimate and proper search into an unreasonable one. "Authorities must be allowed 'to graduate their response to the demands of any particular situation,'" Montoya de Hernández, 473 U.S. at 542 (quoting United States v. Place, 462 U.S. 696, 709 n.10 (1983)), and that is precisely what the CBP officers did here. The officers had reasonable suspicion that Molina was smuggling drugs; they just did not know where the drugs were hidden. There is nothing unreasonable about the officers shifting their attention back to the electronics and giving them a more in-depth look once they were satisfied that the drugs were neither on nor in Molina's body. To the contrary, this approach is eminently reasonable when one

considers that a dog-sniff conducted while Molina was at the hospital showed interest in his laptop.

Similarly, the search did not become unreasonable during the twenty-two days the electronics were detained. The Supreme Court has "consistently rejected hard-and-fast time limits," instead placing an emphasis on "'common sense and ordinary human experience.'" Id. at 543 (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)); see also Flores-Montano, 541 U.S. at 155 n.3 (noting that "[r]espondent points to no cases indicating the Fourth Amendment shields entrants from inconvenience or delay at the international border"). Though twenty-two days does seem lengthy, it is not unreasonable under these circumstances. We will not second-guess the techniques used by the CBP lab and require that a faster alternative -- which could have damaged the electronics during the disassembly and reassembly process, could have put an unnecessary budgetary and workload strain on the lab, or could even have failed to detect the expertly hidden heroin -- be employed.[4] See Montoya de Hernández, 473 U.S. at 542 ("[C]ourts should not indulge in 'unrealistic second-guessing,' . . . . '[T]he fact that the protection of the public might, in the abstract, have been

---

[4] We note that while Molina's laptop and Playstation were detained for twenty-two days, Molina himself was allowed entry into the United States upon his return from the hospital. It would be a different situation -- one we take no position on -- if Molina himself was also forced to stay in detention during the twenty-two days his laptop was being held by CBP.

accomplished by 'less-intrusive' means does not, in itself, render the search unreasonable.'" (quoting Sharpe, 470 U.S. at 686, 687)); id. at 544 (explaining that the Customs officers were not required by the Fourth Amendment to "simply shrug [their] shoulders" and allow an alimentary canal smuggling defendant into the interior because she had been detained for too long before passing cocaine-filled balloons (quoting Adams v. Williams, 407 U.S. 143, 145 (1972))).  Thus, the search of Molina's laptop and Playstation did not violate his Fourth Amendment rights.

## C.  The Further Secondary Questioning

Molina also argues that the further secondary questioning conducted by the CBP officers in a small, windowless room violated his Fifth Amendment rights because he was not given his Miranda warnings prior to being questioned.[5]  We agree.[6]

"The Supreme Court developed the Miranda rules as a prophylactic measure to dissipate the coercion inherent in the custodial interrogation setting, with a goal of ensuring that any

[5]  Molina concedes that the initial questioning by the CBP officers prior to being moved to this room was permissible.

[6]  When Molina moved to suppress his statements in the district court, the government failed to respond.  Molina thus argues that the government has waived any opposition to their suppression.  We disagree.  By denying Molina's motion to suppress, the district court "implicitly for[gave] any waiver that may have occurred." United States v. Scott, 705 F.3d 410, 416 (9th Cir. 2012).  In similar circumstances, we have reached the merits of allegedly waived arguments, and we will do so here as well.  See United States v. Del-Valle, 566 F.3d 31, 37-38 (1st Cir. 2009).

-15-

statements made by a suspect are 'truly the product of free choice'" and consistent with the Fifth Amendment to the United States Constitution. United States v. Vázquez, 857 F.2d 857, 861 (1st Cir. 1988) (quoting Miranda v. Arizona, 384 U.S. 436, 457, 458 (1966)). Accordingly, "[i]t is well established that Miranda warnings must be communicated to a suspect before he is subjected to 'custodial interrogation.'" United States v. Nai Fook Li, 206 F.3d 78, 83 (1st Cir. 2000). Both "custody" and "interrogation" must be present to require Miranda warnings. See, e.g., United States v. Fernández-Ventura, 85 F.3d 708, 710 (1st Cir. 1996) ("Fernández-Ventura I").

Custody exists where there is "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Id. (internal quotation marks and citations omitted). Though custody is a somewhat amorphous concept, relevant considerations in a custody determination include, but are not limited to, "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Id. at 711 (quoting United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987)).

In the border context, we also "must take into account the strong governmental interest in controlling our borders."

United States v. Fernández-Ventura, 132 F.3d 844, 846 (1st Cir. 1998) ("Fernández-Ventura II"). As a result, the rules surrounding Miranda at the border are more relaxed. See United States v. Long Tong Kiam, 432 F.3d 524, 529 (3d Cir. 2006) ("[N]ormal Miranda rules simply cannot apply to this unique situation at the border. This is a situation utterly unlike a normal law enforcement setting." (internal citation omitted)). "[E]vents which might be enough to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into [t]he country." Fernández-Ventura II, 132 F.3d at 847 (quoting United States v. Moya, 74 F.3d 1117, 1120 (11th Cir. 1996)). For example, even though a traveler being questioned by CBP is not "free to leave," he is not necessarily in custody. See Fernández-Ventura I, 85 F.3d at 711 ("[E]ven secondary inspection does not per se constitute custodial interrogation."); id. at 712 (explaining that it "is simply wrong" to conclude that a traveler is in custody because they "may not simply walk away from an interrogating officer" (internal quotation marks omitted)); see also United States v. Butler, 249 F.3d 1094, 1100 (9th Cir. 2001) ("[T]he mere detention of a person in a border station's security office from which he or she is not free to leave, while a search of a vehicle occurs, is not 'custody' for [Miranda] purposes.").

"Relaxed" rules, however, do not mean no rules, and a review of the record persuades us that, given the totality of the

circumstances, Molina was, indeed, in custody during this further secondary questioning.  First, Molina was placed in a small, windowless room, approximately ten-feet-by-ten-feet, with at least two CBP officers.  As we noted in United States v. Pratt, 645 F.2d 89, 90 (1st Cir. 1981), the "confining character of a [C]ustoms questioning cell, combined with isolation with two probing inspectors, . . . creates an oppressive atmosphere that we [cannot] ignore."

Second, Molina was held in this room for between one-and-a-half and two hours.  Though this is "never a singly determinative factor," id. at 91, the longer someone is detained, the more likely he is in custody.  Compare id. at 90-91 (finding that a fifteen-minute encounter "supports a characterization of routine [C]ustoms inquiry rather than custodial interrogation"), and Borodine v. Douzanis, 592 F.2d 1202, 1208 (1st Cir. 1979) (finding that a ten-minute encounter was not custodial and referring to similar cases involving encounters of seventeen-minutes and twenty-minutes), with United States v. García, 496 F.2d 670, 672-73 (5th Cir. 1974) (holding an encounter to be custodial where detention lasted "for at least an hour").  But see Fernández-Ventura II, 132 F.3d at 848 (finding that a one-hour-and-twenty-minute encounter was "not extraordinary" and did not establish custody where the record did not support defendant's allegation that he was "subjected to 'focused questioning'" for that entire time).

-18-

Third, the questioning was not "routine." The CBP officers were no longer probing whether or not to admit Molina into the country, as they had already reviewed Molina's travel documents and therefore confirmed his U.S. citizenship. Instead, they were probing their suspicions of Molina's involvement with drug smuggling activity. Cf. Pratt, 645 F.2d at 91 (finding that because, among other things, "[n]o events transpired to create or to symbolize a high and evident degree of suspicion about the appellant by the agents," the encounter did "not transgress the limits that case law has permitted in the absence of Miranda warnings").[7]

Taken together, we conclude that this encounter -- which involved a lengthy detention in a small, windowless room and probing questions about potential illegal activity -- went above and beyond a routine Customs inspection to determine whether or not Molina should be admitted into the United States. Instead, it was akin to "'a formal arrest or restraint on freedom of movement of

---

[7] Molina also claims that he was handcuffed to the desk throughout the entire encounter. The government, meanwhile, counters that there was no evidence that Molina was handcuffed, outside of his own self-serving statement. It adds that the surveillance video shows Molina leaving the secondary area, being escorted to his carry-on belongings, and returning to the secondary area without restraints; it was not until Molina was transported to the hospital that video footage shows him shackled. Because the government never directly refutes that Molina was handcuffed, this consideration is, at best, ambiguous. Hence, we cannot factor whether Molina was handcuffed into our evaluation of whether he was in custody.

the degree associated with a formal arrest.'" <u>Fernández-Ventura I</u>, 85 F.3d at 710 (quoting <u>Thompson</u> v. <u>Keohane</u>, 516 U.S. 99, 112 (1995)).  Thus, Molina was in custody for <u>Miranda</u> purposes.

Being in custody, however, is only half the equation. Molina must still prove that he was subject to interrogation. "Interrogation refers to both express questioning and its 'functional equivalent,' which includes 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" <u>Id.</u> at 711 (quoting <u>Rhode Island</u> v. <u>Innis</u>, 446 U.S. 291, 301 (1980)). At the same time though, "questions from [Customs] officials are especially understood to be a necessary and important routine for travelers arriving at American entry points." <u>Id.</u>; <u>see also</u> <u>Pratt</u>, 645 F.2d at 90 (explaining that individuals "approach official [airport Customs inspections] inquiry knowing of its greater necessity and routine").  "This understanding cuts against the potentially coercive aspect of the Customs inquiry, and [thus] lessens the need for <u>Miranda</u> warnings." <u>Fernández-Ventura I</u>, 85 F.3d at 711; <u>see also</u> <u>Long Tong Kiam</u>, 432 F.3d at 529 ("We now reaffirm the well-established authority of border inspectors to ask questions of those entering the United States.").  As a result, a "careful examination of all the circumstances" is needed in order

to distinguish between "routine Customs questioning and custodial interrogation."  Fernández-Ventura I, 85 F.3d at 711.

Here, the record is unclear as to what exactly Molina was asked during secondary questioning.  He claims, however -- and the government does not contest -- that he was asked general questions regarding his reasons for traveling to another country, his activities while there, his reasons for entering the United States, and his involvement in drug-trafficking activities.  According to Molina, this was all "interrogation" because he was in custody during the further secondary questioning, and thus "all statements" made while in the small windowless room must be suppressed.

Molina's position is far too broad.  Some of the questions asked, such as Molina's reasons for traveling to Colombia, what he did while there, and why he decided to return when he did, were routine questions which we have held do not constitute interrogation. See, e.g., id. at 710 ("[I]n the Customs context, we have stated that questions from officials are especially understood to be a necessary and important routine for travelers arriving at American entry points."); United States v. Tajeddini, 996 F.2d 1278, 1287-88 (1st Cir. 1993) (asking "where [a traveler] was arriving from and with whom he was traveling" constitute "routine Customs questions" not requiring Miranda warnings); United States v. Ledezma-Hernández, 729 F.2d 310, 313 (5th Cir. 1984) (finding that routine questioning at the border as

-21-

to the traveler's destination and the contents of his truck was not custodial interrogation). Indeed, these are the same questions Molina was asked during his initial questioning, and he has conceded that they were appropriate questions.

The CBP officers' questioning into Molina's involvement with drug activity, however, is more problematic. This line of questioning had nothing to do with whether or not to admit Molina into the country. Instead, these questions "symbolize[d] a high and evident degree of suspicion" by the CBP officers. Cf. Pratt, 645 F.2d at 90-91 (finding that limited questioning seeking an explanation as to why the traveler possessed a ticket issued for another person was routine and did not "create or . . . symbolize a high and evident degree of suspicion about the appellant"). The officers were already leery that Molina may have been involved in drug trafficking, and this line of questioning was clearly aimed at eliciting an incriminating response. See Innis, 446 U.S. at 301; Fernández-Ventura I, 85 F.3d at 710-12 (finding that questions by Customs agents into "whether [the defendants were] carrying any money" would "quite clearly . . . constitute[] interrogation" if the defendants were in custody); see also Long Tong Kiam, 432 F.3d at 530 (explaining that interrogation begins once "the inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal

prosecution"). The questions regarding Molina's drug trafficking activities, therefore, constituted interrogation.

Because Molina was in custody during the further secondary questioning and the questions relating to drug trafficking constituted interrogation, the CBP officers were required to give Molina his Miranda warnings. See Fernández-Ventura I, 85 F.3d at 710. Their failure to do so constituted a Fifth Amendment violation, and as a result any statements made by Molina in response to these questions should have been suppressed by the district court.[8]

### III.  Conclusion

Molina's motion to suppress the heroin seized from his laptop and Playstation was properly denied, as was his motion to suppress regarding the statements made during his further secondary questioning as to his travels to and from Colombia and his plans upon reentry. The statements regarding Molina's drug trafficking activity, however, should have been suppressed. Given the remaining admissible evidence against Molina, it is highly unlikely that the suppression of these statements regarding drug trafficking

---

[8]  It is irrelevant that Molina's responses to the drug-trafficking interrogation were not incriminating. As the Supreme Court explained in Miranda, "no distinction may be drawn between inculpatory statements and statements alleged to be merely 'exculpatory'" because even "statements merely intended to be exculpatory by the defendant are often used to impeach his testimony at trial or to demonstrate untruths in the statement given." Miranda, 384 U.S. at 477.

-23-

activity -- activity that Molina emphatically denied at the time -- would have affected his decision to plead guilty.  Still, that is not our decision to make.  As we explained in <u>United States</u> v. <u>Weber</u>, "a court has no right to decide for a defendant that his decision [to plead guilty] would have been the same had the evidence the court considers harmless not been present."  668 F.2d 552, 562 (1st Cir. 1981) (adopting the rationale of the Seventh Circuit and numerous state courts).  Molina is entitled to determine for himself whether he still wishes to plead guilty given the suppression of the drug-trafficking-related statements, and, therefore, his case is remanded so he may have the option of withdrawing his plea and proceeding to trial should he choose to do so.

**<u>REMANDED</u>**.