# United States Court of Appeals

## For the First Circuit

_____

No. 97-2034

UNITED STATES,
Appellee,

v.

NAI FOOK LI,
Defendant, Appellant.

_____

No. 97-2413

UNITED STATES,
Appellee,

v.

YIU MING KWAN,
Defendant, Appellant.

_____

No. 98-1229

UNITED STATES,
Appellee,

v.

JU LIN,
Defendant, Appellant.

_____

No. 98-1230

UNITED STATES,
Appellee,

v.

BEN LIN,
Defendant, Appellant.

_____

No. 98-1303

UNITED STATES,
Appellee,

v.

HUI LIN,
Defendant, Appellant.

_____

No. 98-1447

UNITED STATES,
Appellee,

v.

MAO BING MU,
Defendant, Appellant.

_____

No. 98-1448

UNITED STATES,
Appellee,

v.

SANG LI,
Defendant, Appellant.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, <u>U.S. District Judge</u>]

_____

Before

Torruella, <u>Chief Judge</u>,

Boudin and Stahl, <u>Circuit Judges</u>.

_____

<u>Charles W. Rankin</u>, with whom <u>Catherine J. Hinton</u>, <u>Rankin & Sultan</u>, <u>Sara A. Rapport</u> and <u>Perkins, Smith & Cohen</u> were on brief, for appellants Nai Fook Li and Yiu Ming Kwan.

<u>Chris H. Mangos</u>, by appointment of the Court, for appellant Ju Lin.

<u>Paul J. Garrity</u>, <u>George F. Gormley</u> and <u>Edward P. Ryan, Jr.</u>, by appointment of the Court, were on joint brief, for appellants Ben Lin, Mao Bing Mu and Sang Li.

<u>Heidi B. Shore</u>, by appointment of the Court, for appellant Hui Lin.

<u>Deborah Watson</u>, Attorney, Department of Justice, with whom <u>Donald K. Stern</u>, United States Attorney, <u>Alex Whiting</u>, Assistant United States Attorney and <u>Susan Hanson-Philbrick</u>, Assistant United States Attorney, were on brief, for appellee.

_____

February 29, 2000
_____

**STAHL, Circuit Judge.** Before the Court are appeals following the conviction and sentencing of defendants-appellants Hui Lin, Nai Fook Li, Yiu Ming Kwan, Ju Lin, Mao Bing Mu, Sang Li, and Ben Lin (the "appellants"). In an en banc opinion issued today, we rejected several arguments three of the appellants raised concerning their purported rights under two international treaties. In this panel opinion, we address the balance of all of the appellants' claims. We reject their challenges, and affirm the convictions and sentences.

We adopt in full, and reference herein, the facts and procedural history as recited in the companion en banc opinion mentioned above. Put very briefly, the appellants engaged in a conspiracy to smuggle nationals of the People's Republic of China ("China") into the United States on a ship called the XING DA. Hui Lin, Yiu Ming Kwan, and Nai Fook Li (the "land-based defendants") operating out of the United States, met with various law enforcement personnel, including Immigration and Naturalization Service Special Agent Michael Rendon and Coast Guard Agent Rick Cox. Rendon, Cox, and their associates posed as fishermen who owned a boat on which they were willing to transport the aliens during the final leg of their journey from China. The land-based defendants negotiated with the agents and acted as liaisons between the agents and the remaining appellants. Meanwhile, Mao Bing Mu, Sang Li, Ju Lin, and Ben Lin (the "shipboard defendants") organized the XING DA's trip from China and traveled

-4-

aboard the vessel as it progressed toward the rendezvous with the agents' boat.  It appears that Ju Lin was, in the words of the XING DA passengers, "the boss," that Ben Lin piloted the ship, and that Mao Bing Mu and Sang Li, among others, acted as "enforcers" to keep the aliens under control during the long trip.  Before its rendezvous with the agents' boat, the XING DA was intercepted and boarded by officers of the United States Coast Guard.

## Discussion

In this opinion, we address various evidentiary and sentencing issues raised by the appellants.  We reject each challenge.

**I.        Denial of Appellant Ben Lin's Motion to Suppress Evidence of His Conduct Tending to Demonstrate That He Was the Captain of the Ship**

Ben Lin argues that the district court erred in refusing to suppress evidence that he went to the bridge of the ship and reduced the speed of the XING DA in response to a request by the Coast Guard boarding team.  He claims that this action constituted a non-Mirandized communicative act in response to custodial interrogation and therefore should have been suppressed under Miranda v. Arizona, 384 U.S. 436 (1966).

It is well established that Miranda warnings must be communicated to a suspect before he is subjected to "custodial interrogation." See United States v. Ventura, 85 F.3d 708, 710 (1st Cir. 1996).  A "custodial situation necessitating Miranda warnings

-5-

arises . . . where 'there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Masse, 816 F.2d 805, 809 (1st Cir. 1987) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). The term "interrogation" encompasses not only express questioning but also "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (internal footnotes omitted).

We do not agree that the Coast Guard's request that the XING DA's crew slow the ship for further boarding can be construed as a custodial interrogation under Miranda. First, notwithstanding any suspicion that the XING DA was smuggling aliens into the United States, the Coast Guard's routine stop, boarding, and inspection of a vessel on the high seas is not considered "custodial." See United States v. Magdaniel-Mora, 746 F.2d 715, 723 (11th Cir. 1984); United States v. Gray, 659 F.2d 1296, 1301 (5th Cir. 1981). The "custody" determination employs an objective test; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. See Ventura, 85 F.3d at 711. By all accounts, the XING DA crew consented to the Coast Guard's boarding. The request that the crew slow the ship -- to which Ben Lin responded -- was made during the opening moments of this boarding. No arrests had been made at that

point, and no accusations of smuggling had been leveled. The officers had merely commenced a routine safety inspection and obtained a copy of the ship's registration papers. Moreover, although the crew members were gathered in one section of the ship during the inspection, it appears that the Coast Guard had neither applied nor threatened any force. Thus, at the time Ben Lin engaged in the putatively communicative behavior at issue, the boarding and inspection had not yet risen to the level of a "formal arrest or restraint on freedom of movement of the degree associated with formal arrest." Stansbury v. California, 511 U.S. 318, 322 (1994); see also United States v. Rioseco, 845 F.2d 299, 303 (11th Cir. 1988) (holding that the appellant was not in "custody" during an initial boarding, despite the existence of probable cause to arrest, because the appellant was not told he was under arrest and because the Coast Guard merely engaged in a routine boarding and inspection procedure in gathering the crew to one area of the ship).

Further, even if appellant had been in "custody" for Miranda purposes, we cannot describe Officer Hilbert's request to slow the ship as "interrogation." The simple request to slow the ship was not a remark that Officer Hilbert should have known was reasonably likely to elicit an incriminating response. Rather, the request appears to be of the type that would normally attend a nautical arrest. Communications that are "normally attendant to arrest and custody" are not

-7-

"interrogation" as the word is understood by Miranda.  Innis, 446 U.S. at 301.

For all of these reasons, we reject Ben Lin's challenge to the district court's denial of his motion to suppress.

**II.** **Admission of Evidence of the Conditions On Board the Ship and the Treatment of the Passengers on the Vessel**

Appellants Mao Bing Mu, Sang Li, and Ben Lin next argue that the district court erred in allowing the government to present evidence concerning the conditions aboard the XING DA, the deprivations suffered by the alien passengers, and the harsh treatment of those passengers. They contend that this evidence should have been excluded under Fed. R. Evid. Rule 403 because its probative value was substantially outweighed by the risk of unfair prejudice. The district court found that the testimony's probative value exceeded any prejudicial impact. Admissibility determinations under Rule 403 are committed to the trial court's sound discretion, see United States v. Rodríguez-Estrada, 877 F.2d 153, 155 (1st Cir. 1989), and we review only for an abuse of that discretion, see United States v. Aguilar-Aranceta, 58 F.3d 796, 801 (1st Cir. 1995). We find no such abuse here.

Appellants refer to the graphic testimony of the filthy conditions prevailing in the hold of the ship, the lack of adequate safety devices on board, and the beatings suffered by the passengers, arguing that this evidence was not relevant to any issues to be determined by the jury and that, even if relevant, it was so unfairly prejudicial that it should have been excluded. We agree with appellants that this evidence was prejudicial in that it had the

potential to inflame the jury against those who created and controlled this inhumane environment.

The government responds first that in order to present proof that the criminal enterprise was conducted "for profit," it needed to establish not only the price paid by the aliens for the 54-day voyage, but also the trip's minimal costs to the coconspirators. Those costs, the government argues, were best evidenced by the XING DA's shoddy conditions, meager provisions, and inadequate safety measures. Second, the government argues that Mao Bing Mu and Sang Li served as "enforcers" over the aliens and that, without evidence of the beatings, the government would not have been able to prove their participation in the conspiracy.

We agree that this evidence was probative to material issues to be determined by the jury, notwithstanding its prejudicial nature. In their brief, appellants admit that the evidence of beatings was relevant to the roles of Mao Bing Mu and Sang Li.[1] In fact, it appears

---

[1] Although appellants concede the relevance of the beatings, they complain that the evidence of the "continuing effects of the beatings" on the victims went far beyond that which was relevant to the role issue. However, the government correctly notes that it did not elicit any such "continuing effects" testimony; appellants did. Chou Lee Li testified on direct examination by the government only that he "felt pain all over" immediately after the beating. It was Ben Lin's counsel who, on cross-examination of Chou Lee Li, introduced Agent Rendon's notes from the Guantanamo Bay interviews, which recounted Li's statement that he still suffered pain from the beating. Sang Li's counsel then offered this statement into evidence. Having brought that evidence out at trial, defendants may not now complain it was error to have let them do so.

that the evidence of the beatings was the only evidence offered that was relevant to this question. As for the evidence of shipboard conditions, evidence of the substantial price paid for passage to the United States goes a long way towards proving profit, but it does not conclusively prove the issue without some showing of the costs of the voyage. Thus, evidence regarding the inadequacy of the vessel, including its physical limitations and spartan provisions, was very probative to this element of the offense.

Having found that the evidence at issue was both prejudicial and probative, we must balance these findings in making a Rule 403 determination. The district court is granted "especially wide latitude" in Rule 403 balancing. See United States v. Rivera, 83 F.3d 542, 545 (1st Cir. 1996). "Only rarely -- and in extraordinarily compelling circumstances -- will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988); see also United States v. Tutiven, 40 F.3d 1, 6 (1st Cir. 1994) (citing Freeman in upholding an admissibility determination), cert. denied, 514 U.S. 1031 (1995). The legal standard is also somewhat weighted in favor of admissibility. In order to be excluded, the evidence must be not only be prejudicial, but unfairly prejudicial, and must not only outweigh

probative value, but <u>substantially</u> outweigh probative value.  <u>See</u>

<u>Rivera</u>, 83 F.3d at 545.

Based on this deferential standard, we cannot find that the district court committed reversible error in admitting the evidence at issue.  While the evidence certainly had a potential for prejudice, it was also highly relevant to issues before the jury.  This case simply does not present the type of "extraordinarily compelling circumstances" that would warrant our upsetting the balance already struck by the district court.  We thus accord deference to the district court's Rule 403 determination.

**III.      Upward Departure Based Upon the Condition of the Vessel and the Treatment of the Passengers Aboard the Vessel**

Appellants Nai Fook Li, Yiu Ming Kwan, Ju Lin, and Hui Lin next argue that the district court erred in imposing an upward departure from the sentencing guidelines due to the conditions on board the vessel and the treatment of the aliens.  At each appellant's sentencing hearing, the court imposed an upward departure pursuant to U.S.S.G. § 2L1.1, Application Note 5, which states that "[i]f the offense involved dangerous or inhumane treatment, death or bodily injury, possession of a dangerous weapon, or substantially more than 100 aliens, an upward departure may be warranted."  The court found by a preponderance of the evidence that each of these four disjunctive conditions existed in this case, based on specific findings of (1)

inadequate food and water; (2) corporal punishment; (3) bodily injury
and threats of serious bodily injury; (4) degrading conditions and
confinement in the hold of the ship; (5) inadequate safety measures on
the ship; (6) possession of numerous weapons; and (7) involvement of
more than 100 aliens.  With respect to appellants Hui Lin and Nai Fook
Li, the court also supported the decision to depart upward by invoking
U.S.S.G. § 5K2.8, which authorizes a departure when the defendant's
conduct was "unusually heinous, cruel, brutal, or degrading to the
victim."

The four appellants argue that the district court erred in
finding that the conditions on board the XING DA were reasonably
foreseeable to them.  In so arguing, appellants recognize that, in the
case of a jointly undertaken criminal activity such as a conspiracy,
each of them is responsible for all of the reasonably foreseeable acts
and omissions of others in furtherance of the conspiracy.  See U.S.S.G.
§ 1B1.3(a)(1)(B).[2]

---

[2]Sentencing Guideline § 1B1.3(a)(1)(B) does not expressly apply to the
upward departure under Application Note 5 to § 2L1.1.  It expressly
applies to determinations of the base offense level, specific offense
characteristics, Chapter Two cross-references, or Chapter Three
adjustments.  However, appellants do not object to the district court's
use of the "reasonably foreseeable conduct" principle in applying these
upward departures; they actually agree with it.  Because we conclude
that the conditions aboard the XING DA were foreseeable to these
appellants, we need not determine whether foreseeability was required
or not.  We will assume arguendo, without holding as much, that
foreseeability was required.

We review departures for abuse of discretion.  See Koon v. United States, 518 U.S. 81 (1996); United States v. Brewster, 127 F.3d 22, 25 (1st Cir. 1997), cert. denied, 118 S. Ct. 1543 (1998).  However, factual findings at sentencing must satisfy only a preponderance of the evidence standard, see United States v. Blanco, 888 F.2d 907, 909 (1st Cir. 1989), and we review those findings only for clear error, see United States v. Mocciola, 891 F.2d 13, 16 (1st Cir. 1989).  Because each appellant challenges factual findings regarding his participation in, knowledge of, or ability to have foreseen the inhumane treatment and conditions aboard the XING DA, it is this latter standard that applies here, at least for Ju Lin, Nai Fook Li, and Yiu Ming Kwan, who have preserved this issue for appeal.  Because Hui Lin did not object to this upward departure at his sentencing hearing, we review his arguments on this issue only for plain error.  See United States v. Forbes, 16 F.3d 1294, 1300 (1st Cir. 1994).

**A.  Hui Lin**

Hui Lin argues that there has been no showing that he anticipated or should have anticipated the actions of the crew or the conditions aboard the XING DA.[3]  He argues that he was not on the ship

---

[3]This position is at odds with the position Hui Lin's counsel took at sentencing, where he argued first that "it was foreseeable that much of this conduct could happen aboard the vessel," and second that Hui Lin and Yiu Ming Kwan did not know that the crew members were "going to go crazy and do the kind of stuff they did," but that they "should have foreseen it."

and did not communicate with the ship during the voyage.  He also argues that there was no evidence that he ever ordered or encouraged the use of force or the deprivations suffered by the passengers.

Hui Lin's argument is unavailing, especially under the applicable "plain error" standard.  The facts (even if true) that he was not on the ship, did not communicate with the ship, and did not order the actions or conditions aboard the ship, do not require the conclusion that Hui Lin could not have known about or at least foreseen the crew's actions or the ship's conditions.  Several factors noted by the government support the opposite conclusion.  First, Hui Lin's planning and negotiation demonstrated that he was clearly in charge of the stateside portion of the smuggling conspiracy.  Second, his concern with finances during the negotiations supports the inference that he understood the importance of frugality with respect to all aspects of the conspiracy.  Third, Hui Lin knew of the inadequacy of the offloading vessel, but arranged for the aliens to be transported into the United States on that vessel anyway.  When it was pointed out that the conditions aboard the fishing vessel would be less than ideal, Hui Lin stated that the aliens would simply have to sit below deck and stay awake for two days.  Fourth, Hui Lin knew that seven or eight enforcers would control the aliens on both the XING DA and the offloading vessel.  We agree with the government that there was little need to provide for enforcers on such a voyage unless the negotiating appellants knew that

the conditions were likely to provoke unrest.  Finally, Hui Lin was present when Nai Fook Li told Agent Rendon that the offloading vessel need not have enough life jackets for the passengers.

From these facts, the district court could properly have found that Hui Lin either knew of or could have foreseen the crew's actions or the dangerous and inhumane conditions aboard the XING DA.  Even if we assume that Hui Lin did not have full knowledge of the manner in which the aliens would be treated, the conversations with the undercover agents demonstrate that he could have and should have foreseen many of the conditions, deprivations, and abuses suffered by the unfortunate passengers.  Thus, the upward departure was not plain error.

**B.  Ju Lin**

Ju Lin offers the weakest argument on this issue.  He contends that it was not shown by a preponderance of the evidence that he controlled or caused the inhumane conditions.  We note first that such direct control or causation of the conditions is not required.  As discussed above, Ju Lin is responsible for the conditions created by his fellow co-conspirators so long as those conditions were reasonably foreseeable to him.  See U.S.S.G. § 1B1.3(a)(1)(B).[4]

Although Ju Lin is correct that there is no evidence that he caused or controlled the food and water deprivations or unsanitary

_____

[4]See note 2, supra.

conditions on the XING DA, there was sufficient evidence to support the inference that Ju Lin could have foreseen that such conditions would exist. The XING DA was at sea for approximately fifty-four days. When, upon boarding the XING DA, Coast Guard Officer Patrick Hilbert asked who was in charge, Ju Lin identified himself as the master of the ship. Indeed, Ju Lin was called "the boss" by others on the ship. It is quite unlikely that the ship's "boss" would not know of or suspect the unsanitary conditions, safety violations, food deprivations, or incidents of violence during its nearly two-month-long voyage.

In any event, there was also compelling evidence of Ju Lin's direct participation in abusing the emigrants. The court heard testimony that Ju Lin personally beat one passenger with a thick wooden stick and personally kicked another as he lay on the deck. This evidence alone is sufficient to support a finding that Ju Lin's offense involved dangerous or inhumane treatment, bodily injury, and possession of a dangerous weapon. Moreover, during both beatings, another crew member told the victim that he was being beaten for stealing food or water. This strongly suggests that Ju Lin knew of the deprivations of food and water that were occurring. For these reasons, we reject Ju Lin's claims regarding the upward departure.

### C. Nai Fook Li and Yiu Ming Kwan

Like Hui Lin, the other land-based appellants, Li and Kwan, claim that the district court erred in finding that the actions of the

crew and the conditions aboard the XING DA were reasonably foreseeable to them.  Again, we review those findings for clear error.  See Mocciola, 891 F.2d at 16.

Li and Kwan claim that the mere request for a departure is inconsistent with the notion that they could reasonably have foreseen what took place aboard the XING DA.  They argue first that it is the very atypicality of such conditions that allows for an upward departure by taking this case outside the "heartland" of § 2L1.1, and second that these atypical conditions would not be foreseen by a defendant simply because he or she committed the crime of alien smuggling.  Li and Kwan claim that they served only as "go betweens" and translators for Hui Lin and Agents Rendon and Cox.  They argue that this role provided them only with the information expressed during the stateside negotiations, which was not sufficient to attribute to them the knowledge or foresight of what would occur during the voyage.

The government responds with several arguments. First, it contends that Li and Kwan were more than just interpreters.  According to Agent Rendon, it was Kwan alone who initially approached him about bringing approximately 100 aliens into the United States.  Kwan later introduced Agent Rendon to Hui Lin, participated in all meetings with the agents, and negotiated the price with the agents.  During the taped negotiations, Kwan spoke of their previous experience in smuggling aliens.  After the XING DA left China, Kwan also provided Agent Rendon

-18-

with updates regarding the voyage.  Nai Fook Li attended all but one of the meetings with the agents.  At one of the meetings, Li told the agents that the aliens would be kept together in the United States until appellants paid the balance due them for their offloading services.  Li gave Agent Cox the XING DA's current coordinates and delivered to Rendon $5000 of the down payment.  We thus agree with the district court that Li and Kwan participated in the substance of the discussions and were more than mere interpreters.

The government also argues that Li and Kwan had reason to know that the conditions aboard the XING DA would be grim.  It stresses that the entire enterprise was profit driven, and that the coconspirators were therefore likely to limit the provisions and amenities provided to the passengers.  As to the offloading vessel, Kwan inspected it himself, so he knew that approximately 100 aliens would be ferried into the United States in the hold of a tiny fishing boat with inadequate facilities.  Both Li and Kwan were present when Hui Lin stated that the aliens would have to cope with the lack of space by foregoing sleep for two days.  Li and Kwan were also present when Hui Lin discussed the seven or eight enforcers who would control the aliens aboard both vessels.  On September 23, 1996, Li himself told the agents that eight men would be on board the ship to control the passengers.  Li and Kwan were also present when Agent Rendon was told that the aliens would board the fishing boat by jumping from the XING

DA.  Later, Agent Rendon informed Hui Lin, Nai Fook Li, and Yiu Ming Kwan that there would not be enough life jackets for the passengers. On September 23, 1996, Kwan told Rendon that only a "little bit of food" was necessary on the offloading boat.

After reviewing this evidence, we cannot fault the district court's conclusion that the actions of the crew and the conditions of the ship were either known by or foreseeable to Li and Kwan, and we certainly do not find this conclusion to be clearly erroneous.  The district court could properly have inferred from their participation in the negotiations with Rendon and his associates that Li and Kwan knew full well what the other members of the conspiracy were planning, and could well have foreseen that some level of inhumane treatment, dangerous conditions, or bodily injury would attend the trip. Therefore, the upward departures were appropriate.

### D. Comparative Degree of Departures Given to Nai Fook Li and Yiu Ming Kwan

Closely related to Li and Kwan's argument that they should not have been given this upward departure is their contention that the district court erred in applying a harsher upward departure to them than was applied to their five more culpable co-defendants. We review the extent of an upward departure for abuse of discretion, using the yardstick of "reasonableness" to determine whether the degree of departure was appropriate. See Brewster, 127 F.3d at 30-31.

Li and Kwan complain that the "inexplicably more severe degree of upward departure" imposed on them is in conflict with established law and the purposes of the sentencing guidelines. They argue that the grounds for departure for each of the seven co-defendants were identical and that although they were the defendants least culpable with respect to these inhumane conditions, they received a disproportionately harsh degree of upward departure. Li and Kwan each received upward departures to sentences of 72 months,[5] which correspond to offense levels of 26 or 27. From this, Li and Kwan subtract their total offense level of 14 to determine that they received an upward departure equivalent to 12-13 offense levels. By contrast, Li and Kwan claim that the other defendants received upward

---

[5]Kwan was actually sentenced to only 36 months, after receiving a § 5K1.1 downward departure for substantial cooperation with the government.

departures equivalent to enhancements of only 9-10 levels (Hui Lin and Mao Bing Mu); 10-11 levels (Ju Lin and Sang Li); and 11-12 levels (Ben Lin). Li and Kwan contend that, at worst, the conditions and treatment of the aliens were only reasonably foreseeable to them, and that there was no evidence that they had any hand in creating those conditions or participating in that treatment. Therefore, they argue that, if anything, they should have received lesser degrees of departure, rather than the greater comparative departure they claim to have received.

However, this analysis is flawed because appellants mistakenly utilize their total offense levels as the starting point for calculating the extent of their departures. Under 8 U.S.C. § 1324(a)(2)(B)(ii), the mandatory minimum sentence for a first or second offense of bringing in an alien for the purpose of private financial gain is three years. Appellants agree that this mandatory minimum applies to their convictions. Sentencing Guideline § 5G1.1(b) provides that, where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the mandatory minimum sentence shall be the guideline sentence. See U.S.S.G § 5G1.1(b). The Commentary to that section gives an example: if the applicable guideline range is 41-51 months and there is a mandatory minimum of 60 months, the required sentence is 60 months and any sentence greater than that would be a guideline departure. This makes it clear that the proper starting point from which a departure is to be subtracted or to

-22-

which it must be added is the greater of the guideline range or the mandatory minimum.  Cf. United States v. Hayes, 5 F.3d 292, 295 (7th Cir. 1993) (holding that the district court did not act improperly in departing downward from a starting point of the mandatory minimum).

It is evident that the district court calculated appellants' sentences in this proper manner.  It first determined that the total offense level for Li and Kwan was 14, which carries a guideline range of 15-21 months for defendants in Criminal History Category I.  Because this range is obviously lower than the applicable 36-month mandatory minimum, the court properly adjusted the guideline range to a "range" of 36 to 36 months before applying any upward or downward departures. It is from this "range" that Li and Kwan's upward departures must be measured.

When the upward departures given to Li and Kwan are calculated from the proper starting point -- the 36-month mandatory minimum -- it becomes evident that Li and Kwan actually received smaller upward departures than any other appellant.  A 36-month sentence corresponds to an offense level of 19 or 20, based on Criminal History Category I.  Therefore, Li and Kwan received an upward departure of seven levels.  By comparison, Ju and Hui Lin received departures of eight levels, Mao Bing Mu received a departure of 9-10 levels, Sang Li received a departure of 10-11 levels, and Ben Lin received a departure of 11-12 levels.  These calculations better

-23-

reflect the magnitude of the departures and clearly defeat Li and Kwan's claim that they received "inexplicably more severe" departures than their co-defendants.

Nevertheless, Li and Kwan argue that, in imposing upward departures on identical grounds, the court must maintain the vertical separation of sentences that the guidelines calculations yield. In a context such as this one, in which statutory mandatory minimum sentences compress much of that vertical separation, appellants' argument is essentially that the court should re-create much of that vertical separation in imposing the upward departures. This would require granting appellants a substantially less severe upward departure than their co-defendants, despite having the same basis for the departure. Doing so would provide the co-defendants with exactly the same "disproportionality" argument appellants raise here. For obvious reasons, this cannot be correct.

IV.     **Six-Level Adjustment to Appellants' Offense Level Because the Offense Involved the Smuggling of 100 or More Aliens**

All seven appellants argue that the district court erred in imposing a six-level increase to their offense levels because more than 100 aliens were involved in their crime. Appellants argue that the district court should have instead imposed a four-level increase because 25-99 aliens were involved. We review for clear error the

district court's factual finding at sentencing that more than 100 aliens were involved.  See Mocciola, 891 F.2d at 16.

The applicable version of Guideline § 2L1.1(b)(2) states that if the offense involved the "smuggling, transporting, or harboring" of 100 or more unlawful aliens, the sentencing court should enhance the defendant's offense level by six levels.  U.S.S.G. § 2L1.1(b)(2)(C). Application Note 1 to that section states that in arriving at the number of aliens the defendant may not be included.

Appellants argue that several of the passengers other than the four shipboard defendants can properly be characterized as participants in the conspiracy and therefore should be excluded. However, they cite no authority for the proposition that co-conspirators who are not co-defendants are to be excluded from the calculation.[6] Instead, appellants argue that the status of the aliens as co-conspirators means that they were not smuggled into the United States "for profit."

The problem with appellants' argument is that § 2L1.1(b)(2)(C) does not require that each of the 100 or more aliens be smuggled "for profit."  The "for profit" definition of Application Note 1 refers to subsection 2L1.1(b)(1), which provides a three-level

_____

[6]In fact, the government offers a strong argument that even co-defendants need not be excluded from the calculation.  Application Note 1 to Section 2L1.1(b) states only that the number of aliens "does not include the defendant"; it does not state that all co-defendants must also be excluded.

decrease if the offense is committed other than "for profit." Subsection 2L1.1(b)(2)(C), the applicable subsection here, prescribes a six-level increase "if the offense involved the smuggling, transporting, or harboring of [100] or more unlawful aliens," and makes no mention of profit. This offense involved the transportation and planned offloading in the United States of 109 aliens, only four of whom were defendants in this case. Whether each of the remaining 105 aliens was smuggled in exchange for payment, work aboard the ship, or nothing at all is irrelevant for purposes of this particular subsection. Therefore, the court did not err in imposing the six-level increase under § 2L1.1(b)(2)(C).

**V.      Denial of Three-Level Decrease For Offenses Committed "Other Than For Profit"**

Appellants Mao Bing Mu, Sang Li, and Ben Lin argue that the district court erred in denying them a three-level decrease under Guideline § 2L1.1(b)(1), for defendants who "commit[] the offense other than for profit." They say that there was no evidence that any of them was to be paid from the profits of the smuggling operation, and that in fact, their only form of compensation was free passage to the United States. Application Note 1 to § 2L1.1 states that a defendant who committed the offense solely in return for his own transportation did not commit the offense "for profit."

The district court found by a preponderance of the evidence that each of the three defendants was motivated by (1) expectations of monetary gains, and (2) hopes of entering and remaining inside the United States. The court found that the defendants were knowing participants in a conspiracy that was expected to yield profits to some members of the conspiracy. The court also found that remaining inside the United States has monetary value because, among other things, the appellants would avoid the payment of fees and expenses incident to a legal entry. The government agrees with appellants that if the evidence demonstrated only that the defendants worked on the ship in exchange for free passage, they would have been entitled to the three-level decrease. However, the court based its decision not to grant the decrease on an "expectation of payment" after their arrival in the United States.

Mu, Li, and Ben Lin argue that the district court engaged in pure speculation when it found that they had an expectation of being paid out of the conspiracy's profits. The government concedes that it offered no specific evidence that Mu, Li, or Ben Lin had an expectation of being paid by the conspiracy, but notes that it was appellants' burden to establish that the downward adjustment was warranted. See United States v. Trinidad-López, 979 F.2d 249, 251 (1st Cir. 1992) ("The validity of any claim of entitlement to a downward adjustment in the base offense level must be demonstrated by the defendant by a

-27-

preponderance of the evidence. The government is not required to establish defendant's disentitlement.") (citations omitted). The government argues that Mu and Li offered no evidence that they participated in the smuggling venture solely in return for their free passage to the United States and that Ben Lin offered only a self-serving declaration that he would receive free passage in exchange for piloting the boat. Thus, the government argues that the only evidence before the district court on the "for profit" issue was the high level of responsibility accorded to Mu, Li, and Ben Lin. The government claims that the district court properly determined that the high level of responsibility given them was indicative of their status as valued members of the conspiracy who would be compensated and was inconsistent with the theory that they were merely working for free passage to the United States.

This is a close question. While we might not entirely agree with the inference of expectation of payment that the district court drew from the level of responsibility shouldered by Mu, Li, and Ben Lin, we do not find the court's decision to deny the downward adjustment to be clear error. Appellants had the burden of establishing by a preponderance of the evidence that they were due to receive only free passage to the United States in exchange for their services, and the district court found that this burden was not met. None of the three appellants offered testimony on this subject, and

-28-

only Ben Lin offered an affidavit stating that he expected only free passage. After viewing and hearing all of the evidence, the district court simply did not believe that Mu, Li, and Ben Lin had no expectation of payment. As the trier of fact for sentencing purposes, the district court had a better sense of the importance of Mu, Li, and Ben Lin to the conspiracy than we can glean from the record. Accordingly, we do not disturb the court's finding that Mu, Li, and Ben Lin failed to carry their burden of demonstrating that they committed the offense "other than for profit."

**VI.      Upward Departure to Appellant Hui Lin's Sentence Based On the Finding That He Was a Leader or Organizer of the Criminal Activity**

Finally, Hui Lin argues that the district court improperly applied a four-level increase to his offense level, based upon his role in the offense as a "leader" or "organizer." Sentencing Guideline § 3B1.1(a) prescribes a four-level increase in a defendant's offense level if he "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). In this context, Hui Lin essentially repeats his argument that he could not have foreseen the treatment of the aliens or the conditions aboard the XING DA -- an argument that we have already rejected.

It is undisputed that this venture involved five or more participants. Evidence was presented that Hui Lin inspected and

approved of Agent Rendon's boat during negotiations; that Hui Lin agreed to pay Agent Rendon $500,000 for use of the boat; that Hui Lin "did most of the talking" during price negotiations; and that Hui Lin gave Agent Rendon over $30,000 as a deposit. This evidence was sufficient to demonstrate that Hui Lin was in charge of the stateside portion of the venture, which was more than sufficient to support a finding that he was a leader or organizer of the criminal activity.

Additionally, we note that Hui Lin was not affected by the district court's decision to apply the "role in the offense" enhancement. Hui Lin's guideline range, after the "role in the offense" enhancement was applied, was only 27-33 months and had to be raised to the statutory minimum of 36 months. If the role in the offense enhancement had not been applied, Hui Lin's guideline range would have been only 15-21 months, which the court would still have had to raise to the statutory minimum of 36 months. As a result, even if the district court had erred in applying the role enhancement, Hui Lin would not have been harmed in any way by the error. This is especially important because Hui Lin did not object at sentencing to the role enhancement. Consequently, we review only for a plain error affecting the defendant's substantial rights. See United States v. Carrozza, 4 F.3d 70, 87 (1st Cir. 1993) (citing United States v. Olano, 507 U.S. 725 (1993)), cert. denied, 511 U.S. 1069 (1994). Because Hui Lin

demonstrates neither such an error nor such an effect, this claim
fails.

## CONCLUSION

Based on the foregoing, we AFFIRM the judgment of the
district court in all respects with regard to all appellants.

**Separate opinion follows.**

**Torruella, <u>Chief Judge</u> (Concurring in part, dissenting in part).** I concur in the panel's decision as to appellants Hui Lin, Nai Fook Li, Yiu Ming Kwan, and Ju Lin. As to appellants Mao Bing Mu, Sang Li, and Ben Lin, however, I respectfully dissent, for the reasons set forth in my dissent from the opinion of the en banc Court.